## THE OHIO STATE UNIVERSITY
## STANDARD LICENSE AGREEMENT

THIS AGREEMENT made effective August 1, 2007 and entered into as of the execution date set forth below, is by and between The Ohio State University, 1100 Kinnear Road, Columbus, Ohio 43212, on behalf of its Office of Trademark & Licensing Services ("Licensor") and NIKE USA, Inc., located at One Bowerman Drive, Beaverton, Oregon 97005-6453.

### WITNESSETH:

WHEREAS, Licensor is the owner of all rights, title and interest in and to certain designations comprising designs, trade names, trademarks, and service marks, including, without limitation, the designations depicted on the camera ready sheets of licensed marks, and other designs, seals, and symbols (hereinafter collectively referred to as "Licensed Marks"), which have come to be associated with The Ohio State University and which will be provided to Licensee with a fully executed copy of this license agreement;

WHEREAS Licensor warrants that the Licensed Marks have been registered in the United States Patent and Trademark Office and/or with the Office of the Secretary of State of Ohio in the name of The Ohio State University;

WHEREAS, Licensee desires a non-exclusive right and license (except exclusively where noted herein) to use the Licensed Marks in connection with its products;

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions herein contained, the parties agree as follows:

1.  DEFINITIONS.

    As used in this Agreement, the terms set forth below shall be defined as follows:

    (a)  "Designation" shall mean NIKE's designation as "the supplier of the athletic footwear and authentic apparel of (designated Team)" and "the athletic footwear and authentic apparel sponsor of (designated Team)" and/or such similar designations as shall be agreed upon by both parties (collectively, the "Designations").

    (b)  "Exclusive Licensed Products" shall mean all of the Products contemplated in Paragraph 2(a)(i)(1) of this License Agreement.

    (c)  "Licensed Products" shall mean all Products distributed by Licensee which bear one or more of the Licensed Marks.

    (d)  "Licensee" shall mean NIKE USA, Inc., its parent NIKE, Inc., and their licensees, distributors, subsidiaries, and any successor company(ies).


EXHIBIT
A

(e) "Net Sales" means the total gross invoiced selling price including the royalty amount, less lawful quantity trade discounts actually allowed and taken as such by customers and shown on the invoice, less any credits for returns actually made, less sales taxes, and less prepaid transportation charges on Licensed Articles shipped by Licensee from its facilities to the purchaser. There shall be no other deductions allowed including, without limitation, deductions for direct or indirect costs incurred in the manufacturing, distributing, selling, importing or advertising (including cooperative and other advertising and promotional allowances) of the Licensed Articles, nor shall any deductions be allowed for non-collected or uncollectible accounts, commissions, cash or early payment discounts, or any other costs. "Net Sales" shall be computed by Licensee's accounting system, guidance for which is established by generally accepted accounting principles.

(f) "NIKE Products" shall mean all Products in connection with which, or upon which, the NIKE name, the Swoosh Design, the NIKE AIR Design, the Jumpman Design or any other trademarks or brands (e.g., Bauer, Starter, Converse) now or hereafter owned and/or controlled by Licensee (collectively, "NIKE Marks") appear.

(g) "Products" shall have the same meaning it has in the Equipment Supply Agreement of even date herewith between the parties, specifically including without limitation golf balls and other sport balls, and shall also include non-athletic or –athletically inspired footwear (e.g. slippers).

(h) "Team" shall mean that group of athletes attending Licensor's Columbus campus during the term of this Agreement and comprising the roster of each Intercollegiate Athletic Program.

(i) "Authentic Competition Apparel" shall mean actual uniforms, sideline apparel and practicewear that members of any Team, Coaches and/or Staff wear or may be reasonably expected to wear while participating in their respective Intercollegiate Athletic Program, which may include but is not limited to: base layer, courtside jackets and sweaters, game-day warm-ups, basketball shooting shirts, football player capes, headwear (including wool or fitted caps), windsuits, rainsuits, sideline or courtside pants, shorts and shirts (including the style of polo/golf shirt worn by coaches and staff). "Authentic Competition Apparel" shall also include any apparel product in any fabrication which imitates or is confusingly similar to the items of apparel enumerated above in this paragraph.

2. GRANT.

(a) Licensor grants to Licensee and Licensee hereby accepts:

(i) The (1) exclusive right and license to manufacture and distribute in all channels Authentic Competition Apparel; all jerseys including without limitation authentic, replica, vintage/throwback, and fashion jerseys in all sizes, adult through infant (but excluding pet apparel), with the understanding that the "Legends of the Scarlet and Gray" vintage jersey licensing program is not automatically a part of this license, but shall be subject to a right of first negotiation and first refusal in Nike's favor as provided below, and may require additional license fees to be paid to those legendary players whose uniform numbers are used; and (2) non-exclusive right and license to manufacture and sell at retail Products other than jerseys and Authentic Competition Apparel, bearing or incorporating Licensor Marks. These rights allow Licensee to use the Licensed Marks solely on and in association with the manufacture, advertising, promotion, distribution and sale of the Licensed Products defined herein and in accordance with the terms of Schedule A hereto. Schedule A is incorporated by reference as part of this Agreement. This License is non-exclusive (except where exclusivity is noted herein), non-transferable, non-assignable outside Licensee's group of affiliated companies, and

includes the right to grant sub-licenses, subject to the reasonable approval of Licensor. Consistent with the foregoing, Licensor specifically approves the granting of sublicenses to Knights Apparel (Starter branded jerseys) and Haddad Brands (apparel in children's sizes). With regard to the "Legends of the Scarlet and Gray" program, the parties agree that Licensor shall negotiate exclusively with Licensee for a period of sixty (60) days before offering that program to any third party, and if the parties fail to reach an agreement during that time, Licensor shall have the right to negotiate with third parties. In the event Licensor receives a third party offer which is acceptable to Licensor, Licensor shall provide to Licensee a complete copy of such offer, on the third party's letterhead or in such other format as to enable authentication of the offeror's identity and terms offered. Licensee shall then advise Licensor within ten (10) business days of receiving the copy of the offer whether Licensee will agree to match or better the offer. Should Licensee do so, the "Legends of the Scarlet and Gray" licensing program shall automatically be deemed included in this License Agreement on the additional terms of the Licensee offer. Should Licensee not do so, Licensor shall be free to enter into an agreement with the offeror on the terms of the offer tendered to Licensee, provided that any material change in the terms of that offer shall trigger a new right to match in favor of Licensee as provided above.

(ii) The right to use game photographs, videotape and/or film footage of any and all Intercollegiate Athletic Programs subject to applicable NCAA rules and regulations with respect to the depiction of eligible athletes. In connection therewith at NIKE's request, University shall permit NIKE to utilize, consistent with this Paragraph 2, University game photographs and footage (owned and/or controlled by University), without a use fee, other than reasonable search and edit charges.

(iii) The right to NIKE Product placement in UNIVERSITY-managed retail locations where Products are sold (including, without limitation, temporary retail locations which are open only on game days), and/or establish NIKE Shops and/or NIKE concept shops therein, and the right to NIKE product placement at University's football stadium and basketball arena concession stands and/or stores during all games (regardless of the sport) held therein. UNIVERSITY's other licensed products may also be offered for sale along with NIKE products. Nothing herein shall require UNIVERSITY to extend the operating hours of any retail location.

(b) Licensed Products shall not be used for any third-party giveaway or other premium purpose without Licensor's prior approval.

(c) During the License Period Licensor shall not grant licenses to, or allow any of the following brands or entities (including their parent, subsidiary, and affiliated companies) to hold licenses for the use of the Licensed Marks on Products in any territory: adidas, Reebok, Puma, UnderArmour. In addition, Licensor shall use its approval powers to ensure in its best faith reasonable judgment that no other licensee creates any t-shirt or other Licensed Product that is confusingly similar to a jersey or to any other Exclusive Licensed Product.

3. TERM.

This Agreement shall commence on August 1, 2007, and shall run for the term recited in Schedule A, unless sooner extended or terminated as provided herein.

4. ROYALTIES.

(a) Licensee shall pay Licensor a royalty percentage as described in Schedule A of this agreement. The royalty shall be based on the Licensed Products' "Net Sales," as defined in Paragraph 1.

(b) Royalties shall be payable in United States Dollars.

5. STATEMENTS AND PAYMENTS.

(a) Licensee shall provide to Licensor, within sixty (60) days after the end of each calendar quarter, a complete and accurate statement of its Net Sales of Licensed Products during the quarter, regardless of whether any sale activity has occurred. The statement may be on Licensee's standard royalty form if it includes, but is not limited to, information about the number, description, gross sales price, discounts given, and returns actually credited of the Licensed Products.

(b) Licensee shall pay any amounts due to Licensor simultaneously with the submission of the quarterly statement.

(c) Interest at a rate of one and one-half percent (1 1/2%) per month (but not to exceed the highest rate of interest permissible under applicable law) shall accrue on any amount due to Licensor from the date upon which the payment is due until the date Licensor receives payment.

6. COMPLIANCE REVIEW.

(a) Licensee shall keep accurate books of accounts and records at its principal place of business necessary to verify the accuracy of Licensee's net sales (the "Records"). Licensee shall retain the Records for at least two (2) years after the expiration of the accounting year to which they relate.

(b) Not more than once per calendar year, Licensor and/or its authorized representatives shall have the right, upon sixty (60) days' prior written notice and at Licensor's sole cost and expense, to inspect and audit the Records during normal business hours. At Licensor's request, Licensee will provide Licensor and/or its authorized representatives the above-referenced invoice detail information in an Excel CD-ROM or disk format. Neither Licensor nor its representatives shall copy or duplicate any Records. Where necessary, Licensor or its representatives may request working copies of audit materials from Licensee's designated personnel. In no event shall Licensor or its representatives remove any Records from Licensee's premises nor shall Licensee be required to provide or make available such Records other than at Licensee's premises. Licensor and/or its representatives shall have reasonable access to said Records for inspection and audit purposes at Licensee's premises, provided that (i) Licensor and its representatives shall comply with Licensee's reasonable security requirements, (ii) such access may not unreasonably interfere with the normal operation of Licensee's business, (iii) any representative of Licensor who conducts or is otherwise involved in any audit shall, prior to receiving any Records from Licensee, sign a confidentiality agreement in a form provided by Licensee, and (iv) Licensee will be permitted to have its personnel present during the audit.

(c) In the event that any such audit or compliance review reveals that Licensee has underpaid, Licensee shall immediately remit payment of that deficiency to Licensor, plus interest calculated at the rate of one and one-half percent (1 1/2%) per month (but not to exceed the highest rate of interest permissible under applicable law) from the date such payment(s) was actually due until the date when such payment(s) is actually made.

(d) In the event that a compliance review shows an underpayment greater than five percent (5%) of the amount reported by Licensee for any Royalty period, Licensee shall reimburse

Licensor for the reasonable costs and expenses of such review, including, but not limited to, any accounting or legal fees.

7.    QUALITY, NOTICES, APPROVALS, SAMPLES, AND LABOR CONDITIONS.

(a)    Licensee may not manufacture, sell, promote, or distribute any Licensed Product until it has obtained the requisite written approvals from Licensor. It is within Licensor's sole discretion to grant or withhold any approval.

(b)    Before Licensee commences marketing or manufacturing a proposed Licensed Product, Licensee must submit (at its own cost) complete layouts and descriptions to Licensor, showing all artwork and exactly where and how the Licensed Marks will be used. Licensee must do so even as to artwork that Licensor previously approved on a different Licensed Product. Licensee shall provide to Licensor one (1) production sample of each style of Licensed Product during each Contract Year. If Licensor desires additional samples of any style, Licensor shall request a reasonable number of such samples at the time approval is given.

(c)    Licensee shall not depart from approved items in any material respect without first obtaining Licensor's express written approval, following the procedure described in paragraph (b) above.

(d)    Licensee shall obtain Licensor's prior written approval in order to use any Licensed Mark in conjunction with a trademark of another entity. As a condition of such use, Licensor may change the Royalty percentage. Trademarks of Licensee's non-Nike affiliated companies shall not be deemed "other entities" for purposes of this License Agreement.

(e)    Upon thirty (30) days' prior written notice, Licensor or its duly authorized representatives shall have the right, once per year during the term of this Agreement, to inspect the distribution premises of Licensee from which the Licensed Products are distributed to insure that standards of quality, as reflected in the approved line art or in any samples of Licensed Products, are being maintained. Any such inspection shall (a) take place during normal business hours, (b) be subject to such reasonable security and confidentiality requirements as Licensee may reasonably require, and (c) not unreasonably interfere with Licensee's operations or prevent or delay Licensee from meeting its delivery obligation to its customers or otherwise cause Licensee to incur "chargebacks" or other costs or expenses in meeting (or being delayed from meeting) such obligations.

(f)    "Seconds" or "Irregular" Licensed Products may be offered for sale at Licensee's Factory Stores and may be sold to other accounts provided that all such Licensed Products are clearly marked as "Irregulars."

(g)    Licensee shall be responsible for ensuring that the Licensed Products are designed and manufactured in compliance with the Consumer Product Safety Act and any other applicable legislation.

(h)    Licensee shall comply, and shall ensure that all third party manufacturers used by such Licensee comply, with the Fair Labor Association ("FLA") Code of Conduct and monitoring (the "Code"). If the Code is modified by the FLA during the term of this License Agreement, Licensee shall comply with the modified Code unless Licensee provides to UNIVERSITY or its licensing agent with written notice that Licensee is terminating this License Agreement, which notice must be provided within ninety (90) days of the FLA's formal adoption of the modified Code. If Licensee does not provide notice of termination, Licensee shall have eighteen (18) months to implement the modified Code. If Licensee provides notice of termination, the provisions of Paragraph 18 shall apply.

8.  IDENTIFYING LABELS.

    (a)  Every individual Licensed Product must display Licensee's name or other identification. It is sufficient for Licensee to display its name or other identification permanently affixed to the Product, on a garment label, hanging tag, or stick-on label. Every individual Licensed Product must bear the Collegiate Licensed Product label in accordance with the Collegiate Licensed Properties Association labeling program.

    (b)  If Licensee fails to display its name or other identification on every Licensed Product, Licensor or its designee may in good faith seize any and all noncomplying Licensed Products, and Licensor shall have no liability for doing so.

9.  ARTWORK.

    (a)  Licensee shall not register or copyright, attempt to register or copyright, or represent that it has registered or copyrighted any of Licensor's Licensed Marks without Licensor's prior written consent. Licensee may, however, copyright artwork or elements of designs created by Licensee which exclude Licensor's Licensed Marks.

    (b)  All artwork and designs which incorporate or include the Licensed Marks shall be and remain the property of Licensor, who shall be entitled to use them subject to the provisions of this Agreement and the Equipment Supply Agreement entered into by the parties.

    (c)  Licensee may only use the symbol® in connection with Licensed Marks actually registered. Licensee may use the symbol™ with all other Licensed Marks.

10.  OWNERSHIP OF RIGHTS.

    (a)  Licensor is the sole and exclusive owner of all rights, title and interest in and to the Licensed Marks and nothing in this Agreement shall be construed as an assignment to Licensee of any such right, title or interest.

    (b)  Licensee recognizes that Licensor may already have entered into, and may, in the future, enter into license agreements with respect to the Licensed Marks for products which are similar to or fall into the same general product category as one or more of the Licensed Products. Licensee expressly acknowledges that the existence of such licenses does not and shall not constitute a breach of this Agreement to the extent such license agreements do not infringe upon the exclusive rights granted to Licensee under this Agreement.

    (c)  Licensee shall not use the Licensed Marks other than as permitted in this Agreement or under other agreements entered into by the parties. In particular, Licensee shall not incorporate Licensor's name or Licensed Marks in Licensee's corporate or business name in any manner whatsoever. Also, Licensee shall in no way represent that it has any rights, title or interest in the Licensed Marks other than those expressly granted under this Agreement.

    (d)  Licensee shall not use or authorize the use of, either during or after the Term of this Agreement, any configuration, trademark, trade name, or other designation confusingly similar to Licensor's name or Licensed Marks.

    (e)  During the Term of this Agreement and thereafter, Licensee shall not contest or otherwise challenge or attack Licensor's rights in the Licensed Marks or the validity of the License granted herein.

11.  DEVELOPMENT OF NEW LOGO & TRADEMARK OWNERSHIP.

    (a)  If Licensor desires to develop an additional trademark, service mark, symbol and/or logographic representing Licensor (collectively, "New Logo"), Licensor shall use its best efforts to notify Licensee (in writing) of such intention and agrees to use its best efforts to

meet with Licensee, upon Licensee's request, to discuss in good faith the use of Licensee's services to design such New Logo. Licensor shall use its best efforts to ensure that such discussions occur prior to Licensor's engaging in negotiations with any third party to provide such design services. Should Licensor elect to have Licensee undertake such design assignment, Licensee shall provide such design services at no expense to Licensor except as provided below in the event Licensee designs such New Logo and it is approved by Licensor, then Licensor shall be the sole owner of all right, title and interest in and to the New Logo but Licensee shall have the non-exclusive right during the Term to develop, promote, market and sell Products bearing the New Logo, and shall have the exclusive right in connection with the Exclusive Licensed Products. Licensor acknowledges that all trademark/copyright registration and maintenance expenses in connection with the New Logo shall be at its expense and Licensee agrees that it shall not incur any such expense on behalf of Licensor without Licensor's prior approval. Licensee agrees that an inadvertent (but not reckless) violation of this Paragraph 11(a) shall not be a material breach of this License Agreement.

(b)    Licensee recognizes the value of Licensor Marks and acknowledges that the goodwill attached thereto belongs to Licensor and that nothing in this Agreement serves to assign, convey or transfer to Licensee any rights, title or interest in or to the Licensor Marks.

12.    GOODWILL AND PROMOTIONAL VALUE.

(a)    Licensee acknowledges that the Licensed Marks and all accompanying rights and goodwill belong exclusively to Licensor.

(b)    Licensee acknowledges that Licensor is entering into this Agreement not only in consideration of the royalties to be paid, but also for the promotional value of Licensee's manufacture, sale, promotion and distribution of the Licensed Product. Accordingly, Licensee acknowledges that its failure to fulfill its material obligations as to quality and otherwise under this Agreement may result in immediate and irreparable damages to Licensor in connection with promotion of the Licensed Marks, and that Licensor may have no adequate remedy at law.

(c)    Licensee therefore agrees that, if it materially breaches this Agreement, Licensor, in addition to all other remedies available, shall be entitled to seek injunctive relief against any such breach.

13.    TRADEMARK, PATENT AND COPYRIGHT PROTECTION.

Each party agrees to reasonably cooperate with the other in protecting and defending the parties' respective marks, specifically including providing, if requested, the identity of any manufacturing resource that a party reasonably believes may be involved in the infringement of its marks, or the identity of the manufacturer of a particular product that is being infringed. In the event that any claim or problem arises with respect to the protection of the Licensed Marks, UNIVERSITY shall promptly advise Licensee in writing of the nature and extent of the problem.

14.    INFRINGEMENTS.

(a)    Licensee agrees to notify Licensor in writing of any infringements or imitations by third parties of the Licensed Marks which may come to Licensee's attention. Licensor shall have the sole right to determine whether or not to take any action on account of any such infringement or imitation. Notwithstanding the foregoing, nothing contained in this Paragraph 14 shall be construed as prohibiting Licensee from commencing any action of its own solely with respect to any infringement of Licensee's own trademarks.

(b) With respect to all claims and suits brought by Licensor, Licensor shall have the sole right to employ counsel of its choosing and to direct the handling of the litigation and any settlement thereof. Licensor is entitled to all amounts awarded as damages, profits, or otherwise in connection with such suits except those damages that a court or jury finds to have been sustained solely by Licensee.

15. INDEMNIFICATION, DEFENSE COOPERATION.

(a) Licensee hereby agrees to defend, indemnify, and hold harmless Licensor, its Board of Trustees, officers, employees, agents, and/or any of its related entities against any and all expenses, claims, demands, causes of action, and judgments arising out of Licensee's design, manufacture, distribution, promotion, or sale of the Licensed Products. Licensee agrees to defend and hold harmless Licensor, its Board of Trustees, officers, employees, agents, and/or their related entities at no cost or expense to them whatsoever including, but not limited to, paying their attorney's fees and court costs. Licensee acknowledges that the Attorney General of the State of Ohio shall have the right to approve the counsel chosen to defend Licensor and shall also have the right to approve any settlement.

(b) Although Licensor, as an instrumentality of the State of Ohio, is prohibited by state law from indemnifying Licensee, Licensor hereby agrees to fully cooperate with Licensee in its defense of any third party claims against it arising out of any claim that Licensee's use of the Licensed Marks as approved by Licensor infringes upon the trademark, copyright or other intellectual property rights of any third party in or to the Licensed Marks. Such cooperation may include, but shall not be limited to, providing, at Licensor's expense, appropriate witnesses, documents (e.g., trademark registrations, affidavits), et cetera.

(c) Licensee recognizes that the Licensed Products and their manufacture are regulated by various federal, national, state, and local laws, ordinances, and regulations, as well as one or more government agencies, including without limitation the United States Consumer Product Safety Commission. In this connection, Licensee shall be responsible for ensuring that the Licensed Products and their manufacture comply with all applicable legal requirements.

16. INSURANCE.

(a) Licensee represents and warrants that the NIKE group of companies of which Licensee is a member has the financial resources to honor Licensee's risk liability under this Agreement and that (i) the NIKE group currently carries excess liability insurance over a one million dollar ($1,000,000) self-insured retention ("SIR"); and (ii) Licensee losses under the SIR are paid from a funded reserve account. In the event Licensee is unable to continue to self-insure at, or beyond, such levels as set forth above, or elects not to self-insure, it shall notify Licensor of same and obtain insurance as prescribed below.

(b) In the event Licensee elects not to, or is unable to, self-insure at or beyond, the levels as set forth in subsection (a) above, Licensee will obtain and maintain general liability, property damage, and product liability insurance providing coverage of at least one million dollars ($1,000,000) per occurrence for personal and advertising injury, bodily injury or death of persons and damage to property that result directly or indirectly from any Licensed Article, Packaging or Advertising Materials.

(c) The Policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection with the Licensed Marks.

(d) The policy shall include The Ohio State University and its Board of Trustees as an additional insured.

(e) The Policy shall provide that, if it is to be modified, canceled, or terminated, the insurer shall give Licensor thirty (30) days advance written notice by Registered or Certified Mail.

(f) Licensee shall furnish Licensor with a certificate of insurance within thirty (30) days after execution of such policy.

17.  ASSIGNMENT AND SUB-LICENSING.

(a) This License is personal to Licensee and shall not be assigned by Licensee, or by operation of law, to any non-"Affiliated Entity." For purposes of this provision, "Affiliated Entity" shall mean any entity which is directly or indirectly controlled by, or under common control of, NIKE, Inc. ("NIKE"), or any greater than fifty percent (50%) owned subsidiary or partnership of NIKE, or any other entity in which NIKE owns greater than twenty percent (20%) of its equity interest. Licensee shall have the right to grant sub-licenses with Licensor's prior express written approval, which shall not be unreasonably withheld. UNIVERSITY acknowledges and agrees that NIKE utilizes and has the right to utilize subcontractor manufacturing facilities for the production of Licensed Products. Licensor acknowledges that as of the date of execution of this License Agreement, Licensee expects to rely upon a sublicensee to produce some or all of the children's sizes of Licensed Products.

(b) Licensor shall not assign its rights and obligations under this Agreement without Licensee's approval.

18.  TERMINATION.

The following termination rights are in addition to the termination rights provided elsewhere in this Agreement.

(a) Immediate Right of Termination. Licensor shall have the right to immediately terminate this Agreement by giving written notice to Licensee if Licensee does any of the following:

(i) Manufactures, sells, promotes, distributes and/or uses, in any way, any Licensed Product without having Licensor's prior written approval as provided in this Agreement, or continues to manufacture, sell, promote, distribute and/or use, in any way, any Licensed Product after Licensee receives notice from Licensor disapproving or withdrawing its approval. It is understood that a reasonable grace period shall apply in order to enable Licensee to bring all such operations to a halt. Licensor agrees that an inadvertent (but not reckless) violation of this Paragraph 18(a)(i) shall not be a material breach of this License Agreement.

(ii) Files a petition in bankruptcy or is adjudicated as bankrupt or insolvent, or makes an assignment for the benefit or creditors or an arrangement pursuant to any bankruptcy law, or if Licensee discontinues its business or if a receiver is appointed for Licensee or for Licensee's business.

(iii) Breaches any of the material conditions or provisions of this Agreement and fails to correct such breach within thirty (30) days after Licensor has given Licensee notice to do so.

(b) Licensee Right to Termination. Licensee may terminate this Agreement upon thirty (30) days written notice to Licensor in the event Licensor breaches any of the material conditions or provisions of this Agreement and fails to correct such breach within thirty (30) days after Licensee has given Licensor notice to do so. In addition, Licensee shall have the right to terminate this License Agreement in the event of any termination (for any reason) of any other agreement between the parties, if any such agreement shall exist at the time.

(c)    Notwithstanding the foregoing, in the event of any material breach or other material failure to perform by any previously approved sublicensee of Licensee, Licensor shall give Licensee written notice of any such breach or failure, specifying the nature of the breach or failure, and the desired remedy, with reasonable particularity. In the event the sublicensee has not substantially cured the breach or failure within a reasonable time (in no event less than 30 days), Licensor's sole remedy shall be the right to revoke its approval of the sublicensee, subject to reasonable provisions for the selling-off of the sublicensee's Licensed Products.

19.    POST-TERMINATION AND EXPIRATION RIGHTS AND OBLIGATIONS.

(a)    Upon termination or expiration of this Agreement, notwithstanding anything to the contrary herein, all Royalties outstanding on sales, shipments, and/or distributions shall become immediately due and payable.

(b)    For one hundred eighty (180) days after termination or expiration of this Agreement, Licensee may complete and dispose of Licensed Products which are on hand or are in the process of manufacture at the time it receives the notice of termination or the Term expires (the "Sell-off Period"). The same terms and conditions agreed to in this Agreement shall govern this final sales period.

(c)    After this Agreement terminates or expires, all rights granted to Licensee shall forthwith revert to Licensor, either directly or indirectly, in connection with the manufacture, sale, promotion, or distribution of Licensee's products.

(d)    Within thirty (30) days after termination or expiration of this Agreement, Licensee shall deliver to Licensor a statement indicating the number and description of the Licensed Products which it had on hand or was in the process of manufacturing as of the expiration or termination date. Licensor may conduct a physical inventory at any time during business hours in order to ascertain or verify such statement.

(e)    Following the expiration of any rights Licensee has under this Section (including the Sell-off Period), Licensor shall have a sixty (60) day option to purchase, at Licensee's wholesale price, all or any portion of goods bearing the Licensed Mark from Licensee's inventory. Licensor shall be free, as mutually agreed with Licensee, to dispose of any goods it purchases. Licensee shall donate the entire remaining inventory to the charity designated by Licensor.

20.    NOTICES.

All notices or other communications to either party shall be in writing and sent by Registered or Certified Mail, return receipt requested postage prepaid to the addresses designated below.

If to Licensor:                The Ohio State University
                                      Office of Trademark & Licensing Services
                                      1100 Kinnear Road, Room 210
                                      Columbus, OH 43212

If to Licensee:                at the address indicated on Schedule A, with a copy to:
                                        Legal Department
                                        Contracts Administrator
                                        Nike USA, Inc.
                                        One Bowerman Drive, DF4

Beaverton, OR 97005

Either party may change its address by giving notice in writing to the other party.

21.    RELATIONS OF THE PARTIES.

This Agreement does not create an employment agreement, agency, partnership or joint venture between the parties and Licensee shall have no power to obligate or bind Licensor in any manner whatsoever.

22.    COMPLIANCE WITH LAWS.

Licensee shall comply with its code of conduct and all applicable laws, including local laws, the laws of the State of Ohio and the laws of the United States of America. Failure to abide by any laws, including but not limited to, the Fair Labor Standards Act, will be grounds for termination of this Agreement.

23.    CAPTIONS.

The paragraph captions are for reference only and shall not be deemed to govern, limit, modify or in any other manner affect the scope, meaning or intent of the provisions themselves.

24.    WAIVER.

(a)    If either party waives any breach or default by the other party, such waiver shall not constitute a waiver of any subsequent breach or default.

(b)    If Licensor resorts to any remedy or remedies, such resort shall not limit Licensor's right to resort to any and all other legal and equitable remedies that are available to it.

(c)    Licensor's failure to enforce any provision of this Agreement or to exercise any of its rights or remedies shall not constitute a waiver of any of Licensor's other rights or any of Licensee's obligations.

25.    SEVERABILITY.

If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision. This Agreement shall be interpreted and construed as if the invalid, illegal or unenforceable term or provision (or portion) had never been contained herein.

26.    INTEGRATION.

As of the effective date hereof, this Agreement shall constitute the entire understanding between UNIVERSITY and NIKE with regard to the specific subject matter hereof and may not be altered or modified except by a written agreement, signed by both parties. Any previous agreements between UNIVERSITY and NIKE with regard to the specific subject matter hereof shall have no further force or effect.

LICENSEE:    NIKE USA, Inc.

BY: _Don Arm_

TITLE: _Regional Counsel USA_

DATE: _6.13.07_

BY: _Tim Mitchell_

TITLE: _LICENSED BUSINESS DIRECTOR_

DATE: _6/8/07_

11

LICENSOR:    The Ohio State University

BY: _____          BY: _____

Richard A. Van Brimmer                    William J. Shkurti

TITLE: Director, Trademark and Licensing   TITLE: Senior Vice President, Business &
          Services                                        Finance

DATE: _____6-1-07_____                  DATE: __6-1-07_____



RECEIVED

JUN 14 2007

Trademark & Licensing

SCHEDULE A

NAME:      NIKE USA, Inc.

ADDRESS:   One Bowerman Drive, Beaverton, OR 97005-6453

CONTACT:   Cyndi Wending - Bldg MP-E

TITLE:     Licensing Manager/Nike Team Sports

PHONE:     503-532-6809              FX:  503-671-6300

1. Licensed Products: as defined in Paragraph 1 of the License Agreement.

2. Term:  This License Agreement shall commence on August 1, 2007 and shall extend until July 31, 2014. In the event Licensee exercises its option to extend its Equipment Supply Agreement with Licensor as provided in Paragraph 12(a) thereof, then this License Agreement shall automatically be deemed extended for the same period, on the same terms and conditions provided herein.

3. Royalty Rate:

A.    With regard to the Exclusive Licensed Products, and effective January 1, 2008, provided that Licensee is in fact the exclusive current licensee authorized to sell such items, Licensee shall annually pay Licensor royalties calculated at the rate of twelve and one-half percent (12.5%) of "net sales" as defined in paragraph 1, during all years of this License Agreement.  Licensee shall send its Royalty Report and any earned royalties within sixty (60) days after the end of each quarter.

B.    With regard to all other Licensed Products (including replica jerseys and performance athletic apparel, prior to January 1, 2008, and during any period thereafter when Licensee is not the exclusive licensee authorized to sell such items) Licensee shall annually pay Licensor royalties calculated at the rate of eleven percent (11%) of "net sales" as defined in paragraph 1, during all years of this License Agreement. Licensee shall send its Royalty Report and any earned royalties within sixty (60) days after the end of each quarter.

4.   Licensed Territory:  The Licensed Territory shall be The United States of America (including Puerto Rico and United States military bases wherever located).  Licensor has assigned its rights outside of The United States of America to a third party.  If Licensee is interested in additional sales territories, it must consult Licensor's agent.  Within the Licensed Territory, Licensee's channels of distribution shall not be restricted.

5.   Minimum Royalty Guarantee:  Licensee shall pay to Licensor a Minimum Royalty Guarantee ("MRG") of $200,000 per year during the original 7-year term of the License Agreement, and $300,000 per year for any option years thereafter. The MRG shall be fully recoupable against Net Sales of Exclusive Licensed Products, except that the MRG shall be fully recoupable against Net Sales of all Licensed Products through December 31, 2007, or such later date as shall be the final date upon which one or more other licensees remains authorized to sell such items. Any shortfall for any license year shall be due and payable within 60 days following the end of the fourth (4th) quarter of that license year.

6..   Schedule A:  This Schedule A is incorporated as part of this license agreement which is hereby fully executed on ___6/8/07_____.

13

**FIRST AMENDMENT TO STANDARD LICENSE AGREEMENT**

On June 1, 2007, The Ohio State University ("OSU") and NIKE USA, Inc. ("NIKE") entered into a standard license agreement (the "Agreement"). The parties hereby agree to amend and modify the Agreement as follows:

1) Schedule A, Paragraph 4 of the Agreement shall be deleted in its entirety and restated as follows:

"4.  Licensed Territory:  The Licensed Territory shall be The United States of America (including Puerto Rico and United States military bases wherever located) and Canada. Licensor has assigned its rights outside of The United States of America and Canada to a third party.  If Licensee is interested in additional sales territories, it must consult Licensor's agent.  Within the Licensed Territory, Licensee's channels of distribution shall not be restricted."

Except as modified by this Amendment, all other terms and conditions of the Agreement shall remain in full force and effect and all rights hereunder shall be exercised consistent therewith.

LICENSEE:     NIKE USA, Inc.

BY: _____     BY: _____

TITLE: _Regional Counsel US_     TITLE: _US Business Dir_

DATE: _2.4.08_     DATE: _1/15/08_


LICENSOR:     The Ohio State University

BY: _____     BY: _____

Richard A. Van Brimmer     William J. Shkurti

TITLE: Director, Trademark and Licensing     TITLE:  Senior Vice President, Business &
Services     Finance

DATE: _12/3/07_     DATE: _11/7/07_

## SECOND AMENDMENT TO STANDARD LICENSE AGREEMENT

On June 1, 2007, The Ohio State University ("UNIVERSITY") on behalf of its Office of Trademark and Licensing Service ("OSU") and NIKE USA, Inc. ("NIKE") entered into a standard license agreement (as amended, the "Agreement"). The parties hereby agree to further amend and modify the Agreement effective August 1, 2015 (unless otherwise indicated) as follows:

1) Paragraph 1 is amended to add the following:

> "1(j)    "Contract Year" shall mean each consecutive twelve (12) month period from August 1 through July 31 during the term of this Agreement, including any extension thereof."

2) Paragraph 2(c) of the Agreement is deleted in its entirety and replaced with the following:

> "(c)    UNIVERSITY agrees that it shall not, directly or through a licensing agent, enter into, or maintain a retail product license with (1) adidas, Reebok, Puma, Under Armour, New Balance, Asics, Saucony, Li-Ning, Anta, Starter and/or their respective affiliates, brands, controlled brands or licensees, the identity of which is known to UNIVERSITY (by notice from NIKE or otherwise), or (2) any other company or brand, the identity of which is known to UNIVERSITY (by notice from NIKE or otherwise) that generates more than both (A) ten percent (10%) of its annual revenue and (B) at least ten million dollars ($10,000,000) annually at wholesale from the sale of athletic footwear (each a "NIKE Competitor"), excluding J. America and any successor chosen by UNIVERSITY to succeed J. America except such successor shall not be a NIKE Competitor, and its respective affiliates, brands, controlled brands or sub-licensees, except none of the foregoing entities shall be known to UNIVERSITY (by notice from NIKE or otherwise) to be a NIKE Competitor. Notwithstanding the above, if UNIVERSITY has an agreement with any company or brand that becomes a NIKE Competitor, UNIVERSITY shall be allowed to continue such agreement but shall not be allowed to renew such agreement. Further, neither the UNIVERSITY nor any of its agents shall permit the sale within any UNIVERSITY-controlled venue (e.g., stadium or arena concessions) or retail establishment (except the parties recognize that UNIVERSITY does not control the UNIVERSITY book store) of any product (whether or not such products bear or incorporate UNIVERSITY Marks) manufactured, branded, licensed or sold by any NIKE Competitor. In the event such concession or retail operation rights are controlled by a third party not under UNIVERSITY control (including, but not limited to, the UNIVERSITY bookstore and licensing agents for post-season competitions for the Teams), UNIVERSITY agrees to advise such third party of the UNIVERSITY's commitment to the NIKE brand and sponsor relationship and the UNIVERSITY's desire to support such brand and sponsor relationship at retail, but

{00284381-1}1

UNIVERSITY shall have no further obligations.  In addition, Licensor shall use its approval powers to ensure in its best faith reasonable judgment that no other licensee creates any t-shirt or other Licensed Product that is confusingly similar to a jersey or to any other Exclusive Licensed Product."

3) Paragraph 17(a) is amended by deleting the second sentence of Paragraph 17(a) and replacing it with the following sentence:

"For purposes of this provision, "Affiliated Entity" shall mean any entity which is directly or indirectly controlled by, or under common control of NIKE, Inc. ("NIKE") or any greater than 50% owned subsidiary or partnership of NIKE."

4) Paragraph 21 of the Agreement is amended to add the following:

"All individuals employed by NIKE to provide personal services to UNIVERSITY under this Agreement are not public employees for purposes of Chapter 145 of the Ohio Revised Code, as amended."

5) The following is added as new Paragraph 27:

"27.    REVIEW.  No later than January 1, 2022 and upon request of the UNIVERSITY, the parties shall meet and discuss in good faith the administration of the Agreement.  Such discussion may include, without limitation, the general terms of the Agreement, the MRG and retail licensing.  The parties agree to meet for a second review no later than January 1, 2029, upon request of UNIVERSITY."

6) Schedule A, Paragraph 2 of the Agreement is amended to extend the "Term" of the Agreement fifteen (15) "Contract Years" from August 1, 2018 through July 31, 2033 (such period the "Extension Period").  In the event the Equipment Supply Agreement between the parties is extended, then the Term of this Agreement shall be automatically extended for the same period, on the same terms and conditions provided herein.

7) Schedule A, Paragraph 3 of the Agreement is amended to provide that, effective August 1, 2015, with regard to all Licensed Products (Exclusive and non-exclusive), excluding footwear, Licensee shall annually pay Licensor royalties calculated at the rate of fifteen percent (15%) of "net sales" as defined in paragraph 1, and with regard to footwear, and effective August 1, 2015, Licensee shall pay Licensor royalties calculated at the rate of five percent (5%) of "net sales", during all Contract Years of the Agreement.  Licensee shall send its Royalty Report and any earned royalties within sixty (60) days after the end of each quarter, except as provided below in this Second Amendment.  If at any time during the Term of this Agreement, Licensee pays any of its collegiate licensors a higher royalty rate than the royalty

{00284381-1}2

rate it is paying Licensor for comparable products or product categories, Licensee shall work in good faith with Licensor to immediately amend this Agreement so that the royalty rates paid to Licensor are equal to the highest royalty rate(s) paid by Licensee to any of its collegiate licensors for comparable products or product categories.

8) Schedule A, Paragraph 5 of the Agreement is amended to add the following new subparagraphs:

> "Over the Extension Period, aggregate royalties paid by Licensee to Licensor shall not be less than $28,800,000 (the "Cumulative MRG").

> If at the end of any Contract Year the total royalties accrued from the beginning of the Extension Period are less than the pro-rata amount of Cumulative MRG through such Contract Year, Licensee shall pay Licensor the amount of any shortfall within sixty (60) days following such Contract Year as reflected in the bullet points immediately below. Any such shortfall payments shall be counted towards satisfaction of the Cumulative MRG as if earned royalties. For the avoidance of doubt, NIKE will pay UNIVERSITY pursuant to the preceding sentence no less than the amounts set forth below, from the beginning of the Extension Period:

> - no less than $1,920,000 at the end of Contract Year 1 of the Extension Period
> - no less than $3,840,000 at the end of Contract Year 2 of the Extension Period
> - no less than $5,760,000 at the end of Contract Year 3 of the Extension Period
> - no less than $7,680,000 at the end of Contract Year 4 of the Extension Period
> - no less than $9,600,000 at the end of Contract Year 5 of the Extension Period
> - no less than $11,520,000 at the end of Contract Year 6 of the Extension Period
> - no less than $13,440,000 at the end of Contract Year 7 of the Extension Period
> - no less than $15,360,000 at the end of Contract Year 8 of the Extension Period
> - no less than $17,280,000 at the end of Contract Year 9 of the Extension Period
> - no less than $19,200,000 at the end of Contract Year 10 of the Extension Period
> - no less than $21,120,000 at the end of Contract Year 11 of the Extension Period
> - no less than $23,040,000 at the end of Contract Year 12 of the Extension Period

- no less than $24,960,000 at the end of Contract Year 13 of the Extension Period
- no less than $26,880,000 at the end of Contract Year 14 of the Extension Period
- no less than $28,800,000 at the end of Contract Year 15 of the Extension Period

Except as modified by this Second Amendment, all other terms and conditions of the Agreement shall remain in full force and effect and all rights hereunder shall be exercised consistent therewith. This Second Amendment may be executed in counterparts manually or by the application of digital or electronic signatures.

LICENSEE:   NIKE USA, Inc.

BY: _____   BY: _____

TITLE: VP NA Sports MLS   TITLE: Executive Vice President Global Sports Marketing

DATE: 12/16/15   DATE: 1-5-16

LICENSOR:   The Ohio State University

BY: Jim Sct   BY: _____

TITLE: Senior Vice President for Business + Finance and CFO   TITLE: Vice President : Director of Athletics

DATE: 12/16/2015   DATE: 12-16-2015

### THE OHIO STATE UNIVERSITY
### APPEARANCE & CONSULTATION AGREEMENT

THIS IS AN AGREEMENT effective on August 1, 2007 by and between The Ohio State University at Columbus, on behalf of its Department of Athletics, having its principal administrative office at 410 Woody Hayes Drive, Room 224, St. John Arena, Columbus, Ohio 43201-2013 (hereinafter "UNIVERSITY"), and NIKE USA, Inc., an Oregon corporation having its principal offices at One Bowerman Drive, Beaverton, Oregon 97005-6453 (hereinafter "NIKE").

### W I T N E S S E T H

WHEREAS, UNIVERSITY fields and maintains nationally recognized athletic teams in numerous sports (and retains the coaches and staff in connection therewith);

WHEREAS, NIKE is a sports and fitness company engaged in the manufacture, distribution and sale of athletic and athleisure footwear, apparel and related accessories, and desires to support UNIVERSITY and its intercollegiate athletic programs as described below; and

WHEREAS, UNIVERSITY desires to acknowledge NIKE's support of the Department of Athletics as described below;

NOW, THEREFORE, in consideration of the mutual promises, terms and conditions set forth herein, it is agreed as follows:

1.  DEFINITIONS.

    As used in this Agreement, the terms set forth below shall be defined as follows:

    (a)  "BCS Bowl" shall mean, as of the date of execution hereof, any of the following bowl games: Orange Bowl, Sugar Bowl, Fiesta Bowl, and Rose Bowl; and shall also mean the fifth bowl game designated as the so-called college football "National Championship" game. In the event of a material change in the college football bowl structure, the parties shall meet in good faith and devise appropriate language to address the new system.

    (b)  "Coach" shall mean an individual employed by UNIVERSITY during the term of this Agreement to act as a head coach of an Intercollegiate Athletic Program.

    (c)  "Coach Attributes" shall mean the name, nickname, initials, autograph, facsimile signature, voice, video or film portrayals, photographs, likeness and image or facsimile image, and any other means of identification used by such Coach.

    (d)  "Conference" shall mean the intercollegiate athletic conference of which UNIVERSITY is a member for the particular Team or Program at issue herein.

    (e)  "Contract Year" shall mean each consecutive twelve (12) month period from August 1 through July 31 during the term of this Agreement, including Option Years, if any.

    (f)  "Flagship Program(s)" shall mean any of the following Intercollegiate Athletic Programs: Football, Men's Basketball, and Women's Basketball.

    (g)  "Game" shall mean game, match, meet, test or such other competition reference as is appropriate to each individual sport.

    (h)  "Intercollegiate Athletic Program(s)" or "Program(s)" shall mean the 36 existing organized team and individual sports (plus cheerleading) sponsored by UNIVERSITY at its Columbus campus and such other replacement or additional intercollegiate athletic

programs as may be established at that campus from time-to-time during the term of this Agreement.

(i) "Intercollegiate Athletic Program Activities" shall mean all games, practices, exhibitions, scrimmages, team appearances, team photo sessions, UNIVERSITY- sponsored sports camps, and other Team-organized activities (including but not limited to photo shoots and interviews) during which Team members, Coaches, and Staff wear and/or use Products.

(j) "Material Acknowledgment Loss" shall mean the removal from Authentic Competition Apparel or footwear of camera-visible manufacturer identification (i.e., the NIKE name or the Swoosh Design) from its current placement location, or the adoption by a national television broadcaster of "virtual signage" applied to Flagship Program game broadcasts which either deletes or obscures manufacturer identification on such Products or replaces it with that of a third party. For purposes of this Agreement, "virtual signage" shall mean use of L-VIS technology or electronic/computer imaging technology that alters, substitutes or replaces NIKE's stadium/arena signage (including NIKE logo identification that appears on uniforms) with other commercial identification that is seen by home television viewers.

(k) "NCAA" shall mean the National Collegiate Athletic Association or the governing body with jurisdiction over intercollegiate competition in any specific sport.

(l) "NIKE" shall mean NIKE USA, Inc., its parent NIKE, Inc., and their licensees, distributors, subsidiaries, and any successor company(ies).

(m) "NIKE Products" shall mean all Products in connection with which, or upon which, the NIKE name, the Swoosh Design, the NIKE AIR Design, the Jumpman Design or any other trademarks or brands (e.g., Bauer, Starter) now or hereafter owned and/or controlled by NIKE (collectively, "NIKE Marks") appear.

(n) "Products" shall mean:

(1) all athletic and athletically inspired or derived footwear (specifically including hockey skates) that members of any Team, Coaches and/or Staff wear or may be reasonably expected to wear while participating in their respective Intercollegiate Athletic Program;

(2) authentic competition apparel consisting of uniforms, sideline or courtside jackets and sweaters, game-day warm-ups, basketball shooting shirts, football player capes, wool and fitted caps, windsuits, rainsuits, sideline or courtside pants, shorts and shirts, and similar apparel, and practicewear (collectively, "Authentic Competition Apparel") that members of any Team, Coaches and/or Staff wear or may be reasonably expected to wear while participating in their respective Intercollegiate Athletic Program;

(3) all other apparel articles of an athletic or athleisure nature including but not limited to tank-tops, T-shirts, sweatsuits, separates and other body coverings, and accessories of an athletic or athleisure nature, including but not limited to headwear, headbands, wristbands, bags, socks, hand-towels (not including Gatorade or other sport drink towels in the Teams' bench areas), receiver's and linemen's gloves, batting gloves, that members of any Team, Coaches and/or Staff wear or use or may be reasonably expected to wear or use while participating in their respective Intercollegiate Athletic Program; and

(4) sports equipment including, but not limited to, inflatable balls (specifically including without limitation basketballs and volleyballs); baseball bats and other baseball equipment; softball equipment (excluding bats, fielding gloves, and catchers' equipment); hockey equipment; non-prescription protective eyewear, eyewear with performance attributes and sunglasses; sports timing devices (including wristwatches, race timers, stopwatches, etc. and devices used for competition or training that are also used in combination with timing devices such as heart-rate monitors or calorimeters; excluding golf clubs, but including such other equipment as NIKE may add to its product lines at any time during the term of this Agreement and subject to the provisions of Paragraph 13 below, provided that such Products shall meet UNIVERSITY's good faith requirements for quality.

(o) "Staff" shall mean, collectively, all assistant coaches and strength coaches, equipment managers, trainers and any on-field/courtside staff (e.g., ballpersons) employed by UNIVERSITY during the term of this Agreement to provide services to Intercollegiate Athletic Programs.

(p) "Team" shall mean that group of athletes attending the UNIVERSITY's Columbus campus during the term of this Agreement and comprising the roster of each Intercollegiate Athletic Program.

(q) "Tier I Bowl" shall mean any of the following non-BCS Bowl games traditionally played on New Year's Day and such additional or replacement New Year's Day bowl games as may be established: the Citrus; Cotton; Gator; or Outback Bowl.

(r) "UNIVERSITY Marks" shall mean the names, nicknames, mascots, trademarks, service marks, logographics and/or symbols, and any other recognized reference to UNIVERSITY or its Intercollegiate Athletic Programs.

(s) "UNIVERSITY Web Site[s]" shall mean the official Internet World Wide Web site of the UNIVERSITY's athletic department, presently named <http://www.ohiostatebuckeyes.cstv.com>, and/or any other "official" web site designated as such by the UNIVERSITY's athletic department. It is understood that <http://www.osu.edu> is not included in this definition.

2.    TERM.

This Agreement shall remain in full force and effect for a period of seven (7) Contract Years, from August 1, 2007 through July 31, 2014, unless extended as provided in Paragraph 6 (a) hereof or sooner terminated in accordance with the terms and conditions hereof (the "Term"). This Agreement shall be interpreted in its entirety and not as a series of one-year agreements.

3.    APPEARANCES, USE OF COACH ATTRIBUTES.

(a) In an effort to promote sports participation and the values associated with such participation and to promote UNIVERSITY's athletic programs in particular, each Contract Year, upon reasonable prior notice and subject to any coaching commitment, if so requested by NIKE, UNIVERSITY shall make the Coach of each Intercollegiate Athletic Program available for a minimum of one (1) personal appearance on behalf of NIKE, except that the Coach of the football team and men's and women's basketball teams shall each be made available for up to four (4) appearances, and the Coaches of the men's and women's soccer programs shall each be made available for up to four (4) appearances. No single appearance shall exceed twenty-four (24) hours in duration, including travel time, unless otherwise agreed upon in advance. Such appearances

may include, but are not limited to, speaking engagements, appearances at sports clinics, celebrity events and other public appearances. No such appearance shall require any Coach to participate in messaging in any media which contains, in the UNIVERSITY's discretion, comparative or qualitative descriptions of Nike's products, price information or other indications of savings or value about Nike's products, any message that otherwise endorses Nike's products or induces one to purchase or use Nike's products, or any message that causes Nike's payments to not be treated as "qualified sponsorship payments" as that term is defined in Internal Revenue Code Section 513(i) and related regulations. The parties recognize that UNIVERSITY is more familiar with such regulations than NIKE and it shall be UNIVERSITY's responsibility to exercise its right of approval to prevent this outcome. In this connection, the parties agree that all determinations regarding compliance with Internal Revenue Code Section 513(i) shall be made in the sole good-faith discretion of UNIVERSITY. UNIVERSITY shall receive no additional compensation for such appearances, it being understood that the consideration for such appearances is encompassed by the Compensation paid to UNIVERSITY pursuant to Paragraph 5 below.

(b) Once during the Term, upon reasonable prior notice and subject to any other playing commitments, and if permitted under applicable NCAA and/or Conference rules or regulations, UNIVERSITY shall make its men's basketball team available to participate in a NIKE-sponsored basketball tournament.

(c) NIKE shall pay all reasonable and necessary travel and related expenses of each Coach, or the basketball team if applicable, in connection with any appearance hereunder.

(d) In addition to the foregoing, subject to UNIVERSITY's prior approval in accordance with its approval rights under the parties' Equipment Supply Agreement with regard to NIKE's use of UNIVERSITY Marks, and consistent with subparagraph (a) above, NIKE shall be permitted to use Coach Attributes in connection with acknowledgments of NIKE's sponsorship of UNIVERSITY's Intercollegiate Athletic Programs.

4. DESIGN CONSULTATION.

(a) NIKE shall continue its efforts to produce high quality Products through consultation with coaches and staff of successful athletic programs such as UNIVERSITY and whose full cooperation is important to NIKE, as such individuals have knowledge that can be useful in the research, development and production of NIKE Products. UNIVERSITY shall assist in such process in an effort to ensure Team members' safety and to provide the best available equipment to Teams and to enhance the competitiveness of Teams. Upon request by NIKE, UNIVERSITY shall use its best efforts to provide NIKE with written or oral feedback from Coaches and Staff designated by NIKE concerning the NIKE Products supplied to each through NIKE's product development and testing program. Such reports shall address the fit, wear characteristics, materials and construction techniques of such Products.

(b) In an effort to ensure Team members' safety, comfort and competitiveness, UNIVERSITY shall require its coaches, as requested by NIKE, to test such specific models and/or styles of NIKE Products as NIKE may designate from time-to-time. Teams shall wear any NIKE model and/or style as they and their coaches may reasonably choose (consistent with NIKE's requests whenever possible).

5. CASH COMPENSATION.

Each Contract Year NIKE shall pay UNIVERSITY Cash Compensation in the amount of fifty thousand dollars ($50,000) as follows: twenty-eight thousand dollars ($28,000) for appearances; and twenty-two thousand dollars ($22,000) for design and marketing consultation, all to be paid annually on or before June 1.

6. NIKE OPTION AND RIGHT OF FIRST REFUSAL.

(a) NIKE shall have an option to extend this Agreement for an additional term of three (3) Contract Years on the same terms and conditions (except as expressly provided herein) by giving notice to UNIVERSITY not later than February 1, 2013.

(b) Prior to February 1, 2013 (or February 1, 2016 if this Agreement has been extended by NIKE as provided in Paragraph 6 [a]) (in either case, the "Negotiating Date"), UNIVERSITY shall not engage in discussions or negotiations (nor shall UNIVERSITY permit its agents, attorneys or representatives to do so) with any third party regarding appearance and consultation services with respect to any Products used by any UNIVERSITY Intercollegiate Athletic Program (or similar supply or promotional arrangement) with respect to any Products ("Appearance and Consultation Rights") after the Term.

(c) During the Term and for a period of one hundred eighty (180) days thereafter, NIKE shall have the right of first refusal for Appearance and Consultation Rights, as follows. If UNIVERSITY receives any bona fide third-party offer at any time on or after the Negotiating Date with respect to any Appearance and Consultation Rights, UNIVERSITY shall submit to NIKE in writing the specific terms of such bona fide third-party offer. NIKE shall have fifteen (15) business days from the date of its receipt of such third-party offer to notify UNIVERSITY in writing if it will enter into a new contract with UNIVERSITY on terms no less favorable to UNIVERSITY than the material, measurable and matchable terms of such third-party offer. If NIKE so notifies UNIVERSITY within such 15-day period, UNIVERSITY shall enter into a contract with NIKE on the terms of NIKE's offer. If NIKE fails or declines to match or better the material, measurable and matchable terms of such third-party offer within such 15-day period, UNIVERSITY may thereafter consummate an agreement with such third party on the terms of the offer made to UNIVERSITY. Prior to the Negotiating Date, UNIVERSITY shall not solicit, consider or present to NIKE, and NIKE shall not be obligated to respond to, any third-party offer for any Appearance and Consultation Rights.

7. RIGHT OF TERMINATION BY UNIVERSITY.

UNIVERSITY shall have the right to terminate this Agreement immediately upon written notice to NIKE if:

(a) NIKE is adjudicated insolvent or declares bankruptcy;

(b) NIKE fails to make payment to UNIVERSITY of any sum due pursuant to this Agreement within thirty (30) days following NIKE's receipt of written notice from UNIVERSITY that such payment is past due; or

(c) NIKE breaches any other material provision of this Agreement, which breach NIKE fails to cure within thirty (30) days of NIKE's receipt of written notice from UNIVERSITY specifying the breach.

8.  RIGHT OF TERMINATION BY NIKE.

(a) NIKE shall have the right to terminate this Agreement immediately upon written notice to UNIVERSITY if:

(1) Any Coach or Staff member fails to perform any material obligation provided for in this Agreement;

(2) Athletic Department administration, Coaches or Staff disparages the quality or performance of NIKE Products or the brand; or

(3) UNIVERSITY breaches any warranty or other material term of this Agreement, which breach UNIVERSITY fails to cure, if curable, within thirty (30) days of NIKE's delivery of written notice to UNIVERSITY of any such breach.

(4) In the event of the termination (for any reason) of any other agreement between the parties, if any such agreements shall exist at the time.

(b) In the event of termination under this Paragraph or Paragraph 7, UNIVERSITY shall not be entitled to any further compensation under this Agreement, except any unpaid Cash Compensation, pro-rated over the entire Contract Year and calculated to the effective date of termination. Alternatively, NIKE shall have the right to receive from UNIVERSITY reimbursement for Cash Compensation, if any, paid in excess of the amount to which UNIVERSITY would be entitled if the Cash Compensation were pro-rated over the entire Contract Year, calculated to the effective date of termination. Any such payment shall be due within thirty (30) days of the date of termination.

9.  INDEMNIFICATION.

NIKE shall defend, indemnify and hold harmless UNIVERSITY, its Board of Trustees, directors, officers, employees and agents (collectively, "UNIVERSITY Parties") from and against all suits, actions, claims, judgments, damages, losses or other liabilities, and all costs and expenses, including reasonable attorney fees, ("Claims") incurred by any UNIVERSITY Parties in connection therewith, arising out of or relating to NIKE's: (i) breach of any material term of this Agreement; or (ii) acts or omissions of NIKE, or those of its employees and/or agents; provided NIKE is given prompt written notice of and shall have the option to undertake and conduct the defense of any such Claim (subject to the Ohio Attorney General's statutory authority to appoint legal counsel with respect to UNIVERSITY and approve settlements with respect to UNIVERSITY). In any instance to which the foregoing indemnities pertain, UNIVERSITY Parties shall cooperate fully with and assist NIKE in all respects in connection with any such defense, and no UNIVERSITY Party shall enter into a settlement of such Claim or admit liability or fault on the part of NIKE without NIKE's prior written approval. With respect to Internal Revenue Code Section 513(i) and related regulations, it shall be UNIVERSITY's responsibility to exercise its rights of approval over messages for and about NIKE to ensure that NIKE's payments hereunder are treated as "qualified sponsorship payments." Provided that NIKE complies with all of the approval requirements herein for sponsorship recognition and other messaging, NIKE shall not bear any responsibility for any finding by the Internal Revenue Service which results in the payment of more tax by UNIVERSITY.

10. REMEDIES.

UNIVERSITY and NIKE agree that, in the event that either party breaches any material term or condition of this Agreement, in addition to any and all other remedies available to the non-breaching party at law or in equity, the non-breaching party shall be entitled to seek

injunctive relief from such further violation of this Agreement, pending litigation as well as on final determination of such litigation, without prejudice to any other right of such other party.

11. NOTICES.

All notices, statements and payments provided for herein shall be in writing and deemed given if sent postage prepaid via registered or certified mail, or by express courier service or facsimile with confirmed delivery, to the parties at the addresses given below, or such other addresses as either party may designate to the other. Any written notice shall be deemed to have been given at the time it is sent addressed to the parties as set forth below. It is UNIVERSITY's obligation to notify NIKE of any address change.

| NIKE, Inc.<br>One Bowerman Drive<br>Beaverton, OR 97005-6453<br>Attn: Director of Sports Marketing, U.S. | The Ohio State University<br>Dept. of Athletics<br>410 Woody Hayes Drive, Rm. 224<br>Columbus, OH 43210-1166<br>Attn: Senior Associate Athletic Director for Finance & Operations |
|---|---|
| cc: Legal Dept., Contracts Administrator (on any notice of breach) | cc: Attn: Office of Legal Affairs, Julie D. Vannatta (on any notice of breach)<br>AS OF DATE OF EXECUTION HEREOF:<br>33 West 11th Avenue, Suite 209<br>Columbus, OH 43201-2013<br>EFFECTIVE MARCH 2007:<br>1590 North High Street, Suite 500<br>Columbus, OH 43201-2178 |

12. RELATIONSHIP OF PARTIES.

The performance of services for NIKE by UNIVERSITY is in the capacity of independent contractors. Accordingly, nothing contained in this Agreement shall be construed as establishing an employer/employee, partnership or joint venture relationship between UNIVERSITY and NIKE.

13. ASSIGNMENT/DELEGATION/PASS THROUGH.

(a) This Agreement and the rights and obligations of UNIVERSITY hereunder are personal to UNIVERSITY and shall not be assigned or delegated by UNIVERSITY. Any assignment by UNIVERSITY shall be invalid and of no force or effect and upon any such unauthorized assignment, NIKE may, at its option, immediately terminate this Agreement upon written notice to UNIVERSITY.

(b) The rights granted to NIKE by UNIVERSITY hereunder are personal to NIKE and shall not be assigned, delegated or passed-through outside of NIKE and its retail accounts without UNIVERSITY's prior approval, which approval shall not be unreasonably withheld.

14. WAIVER.

The failure at any time of UNIVERSITY or NIKE to demand strict performance by the other of any of the terms, covenants or conditions set forth herein shall not be construed as a continuing waiver or relinquishment thereof, and either party may, at any time, demand strict and complete performance by the other party of such terms, covenants and conditions.

15. SEVERABILITY.

Every provision of this Agreement is severable. If any term or provision hereof is held to be illegal, invalid or unenforceable for any reason whatsoever, such illegality, invalidity or unenforceability shall not affect the validity of the remainder of this Agreement or any other provision and the illegal, invalid or unenforceable provision shall be deemed by the parties as replaced by such substitute provision as shall be drafted by NIKE, and approved by UNIVERSITY, in such form and substance as shall be legally valid, and as shall accomplish as near as possible the purpose and intent of the invalidated provision.

16. ADDITIONAL WARRANTIES.

UNIVERSITY represents and warrants that:

(a) Neither UNIVERSITY nor any Coach nor Staff member is party to any oral or written agreement, contract or understanding which would prevent, limit or hinder the performance of any obligations hereunder of UNIVERSITY, Coaches or Staff. UNIVERSITY further represents and warrants that during the term hereof UNIVERSITY will not, without the prior written consent of NIKE:

(1) Allow any Coach or Staff member to wear and/or use athletic footwear or other Products sold by any manufacturer or seller other than NIKE during Intercollegiate Athletic Program Activities. NIKE acknowledges that any Coach's wearing of non-athletic footwear and apparel in connection with his or her official coaching duties, as appropriate, shall not constitute a breach of this agreement;

(2) Sponsor, enter into, or allow any Coach or Staff member to enter into, any sponsorship, product supply or similar agreement for athletic footwear or other Products with any manufacturer or seller other than NIKE; or

(3) Knowingly take any action inconsistent with acknowledging NIKE's sponsorship, or allow any Coach or Staff member to take any such action.

(b) It has the full legal right and authority to enter into and fully perform this Agreement in accordance with its terms and to grant to NIKE all the rights granted herein.

17. CONFIDENTIALITY.

UNIVERSITY shall not (nor shall it permit or cause its employees, agents or representatives to) disclose the financial terms of this Agreement, the marketing plans of NIKE, or other confidential material or information disclosed to UNIVERSITY (including information disclosed during audit), to any third party, except to its trustees or as may be required by law.

18. CAPTIONS.

Paragraph captions and other headings contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of the Agreement or any provision hereof.

19. CONTRACT CONSTRUCTION.

Notwithstanding any provision contained heretofore in this Agreement, the provisions of this Agreement shall be construed in a manner consistent with the intentions of UNIVERSITY and NIKE that all amounts received under this Agreement be payments for appearances designed to acknowledge NIKE's sponsorship of UNIVERSITY's Intercollegiate Athletic Programs and to compensate UNIVERSITY for its consultation related to Product performance. Consistent with that intent, nothing produced by NIKE under this Agreement

shall contain: qualitative or comparative language; price information or other indication of savings or value associated with a product or service; a call to action; an endorsement or an inducement to buy, sell, rent or lease NIKE Products or services.

20.    ENTIRE CONTRACT.

As of the effective date hereof, this Agreement shall constitute the entire understanding between UNIVERSITY and NIKE with regard to the specific subject matter hereof and may not be altered or modified except by a written agreement, signed by both parties. Any previous agreements between UNIVERSITY and NIKE with regard to the specific subject matter and Term hereof shall have no further force or effect.


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.


THE OHIO STATE UNIVERSITY                    NIKE USA, Inc.

By: _William J. Shkurti_                     By: _Kit Morris_
    William J. Shkurti                           Kit Morris
    Senior Vice President for Business & Finance     Director of College Sports Marketing

Fed. Id. No: _31-602-5986_

By: _Eugene D. Smith_                         By: _Adam S. Helfant_
    Eugene D. Smith                              Adam Helfant
    Director of Athletics                        Vice President, Global Sports Marketing

## FIRST AMENDMENT TO APPEARANCE & CONSULTATION AGREEMENT

The Ohio State University ("OSU") and NIKE USA, Inc. ("NIKE") entered into an Appearance & Consultation Agreement (the "Consultation Agreement") effective August 1, 2007. The parties hereby agree to amend and modify the Consultation Agreement as follows:

(1) Paragraph 1(n)(1) is deemed amended to delete hockey skates.

(2) Paragraph 1(n)(2) is deemed amended to exclude competitive technical swimsuits.

(3) Paragraph 1(n)(4) is deemed amended to delete hockey equipment, to delete baseball bats and to exclude catcher's mitts.

(4) Paragraph 6(a) is deleted in its entirety and restated as follows:

"(a)   NIKE shall have an option to extend this Agreement for an additional term of four (4) Contract Years (i.e. August 1, 2014 – July 31, 2018) on the same terms and conditions as prevailing for Contract Year 7 (except as otherwise expressly provided in the Consultation Agreement and any amendments thereto) by giving notice to UNIVERSITY not later than February 1, 2013."

(5) Paragraph 6(b) is deleted in its entirety and restated as follows:

"(b)   Prior to February 1, 2013 (or February 1, 2017 if this Agreement has been extended by NIKE as provided in Paragraph 6(a), as amended above under this First Amendment) (in either case, the "Negotiating Date"), UNIVERSITY shall not engage in discussions or negotiations (nor shall UNIVERSITY permit its agents, attorneys or representatives to do so) with any third party regarding appearance and consultation services with respect to any Products used by any UNIVERSITY Intercollegiate Athletic Program (or similar supply or promotional arrangement) with respect to any Products ("Appearance and Consultation Rights") after the Term."

{00171869-2}

Except as expressly modified above, the Consultation Agreement remains in full force and effect.

NIKE USA, Inc.

BY: _____

TITLE: VP, NA Sports Mktg.

DATE: 10/8/12

BY: Gary D. Way

TITLE: Global Counsel, Sports Marketing

DATE: 10/12/12

The Ohio State University

BY: Geoffrey S Chatas

Geoffrey S. Chatas
Sr. Vice President for Business & Finance and CFO

DATE: 8.8.12

BY: _____

TITLE: _____

DATE: _____

### SECOND AMENDMENT TO APPEARANCE & CONSULTATION AGREEMENT

The Ohio State University at Columbus ("UNIVERSITY") and NIKE USA, Inc. ("NIKE") entered into an Appearance & Consultation Agreement effective August 1, 2007 and amended October 12, 2012 (the "Consultation Agreement").   The parties hereby agree to further amend and modify the Consultation Agreement effective August 1, 2015 as follows:

1.  Paragraph 1(a) shall be deleted in its entirety and replaced with the following:

> "College Football Playoff" or "CFP" shall mean the NCAA Football Bowl Subdivision national championship game and the two (2) bowl games designated from the following six (6) bowl games (or replacement bowl games) to serve as the NCAA Football Bowl Subdivision semifinals during the relevant Contract Year: Peach Bowl, Cotton Bowl, Orange Bowl, Sugar Bowl, Fiesta Bowl, and Rose Bowl. In the event of a material change in the CFP, the parties shall meet in good faith and devise appropriate language to address the new system."

2.  Paragraph 1(n) is deleted in its entirely and replaced with the following:

> "Products" shall have the meaning set forth in the Equipment Supply Agreement of the same date herewith between the parties."

3.  Paragraph 2 is amended to extend the "Term" of the Agreement fifteen (15) "Contract Years" from August 1, 2018 through July 31, 2033 (such period shall be referred as the "Extension Period", and together with all other Contract Years, the "Term"), unless extended under Paragraph 6(a) as amended by this Second Amendment.

4.  Paragraph 3(a) is amended so that UNIVERSITY makes available the head football coach for four (4) appearances and the head men's and women's basketball coaches for three (3)  appearances each. Any additional head Coach appearances requested by NIKE shall be discussed in good faith, but for avoidance of doubt, UNIVERSITY shall not be obligated to comply with NIKE's request.

5.  Paragraph 5 is deleted in its entirety and replaced with the following:

> "Each Contract Year, NIKE shall pay UNIVERSITY cash compensation in the amount of sixty thousand dollars ($60,000) as follows:  forty thousand dollars ($40,000) for appearances; and twenty thousand dollars ($20,000) for design consultation to be paid by NIKE to the UNIVERSITY no later than June 1 each Contract Year."

6.  Paragraph 6(a) is deleted in its entirety and restated as follows:

> "(a)   In the event the Equipment Supply Agreement between the parties is extended, then the Term of this Consultation Agreement shall be automatically extended for the same period, on the same terms and conditions provided herein."

7.  Paragraph 6(b) is amended to provide that the "Negotiating Date" shall be October 1, 2031.

1

8.  The first sentence of Paragraph 6(c) is amended to delete the reference to "one hundred eighty (180)" and replace such reference with "ninety (90)".  All other terms of such Subparagraph remain unchanged.

9.  Paragraph 11 is amended to change the address of the UNIVERSITY's Department of Athletics as follows:  Fawcett Center, 2400 Olentangy River Rd., Columbus, OH 43210 and to change the address of the UNIVERSITY's Legal Department as follows:  1590 N. High St., Suite 500, Columbus, OH 43201

10. Paragraph 12 is amended to add the following:

> "All individuals employed by NIKE to provide personal services to UNIVERSITY under this Agreement are not public employees for purposes of Chapter 145 of the Ohio Revised Code, as amended."

11. The parties further acknowledge and agree that the terms of the Consultation Agreement are intended to supplement and be exercised consistent with the terms of the Equipment Supply Agreement.  In the event of any conflict or inconsistency between the Consultation Agreement and the Equipment Supply Agreement, the Equipment Supply Agreement shall control.  Furthermore, any amendment of the definitions or Right of First Refusal in the Equipment Supply Agreement shall also serve to automatically amend the same (or similar) provisions of the Consultation Agreement.  In the event the Equipment Supply Agreement is terminated, the Consultation Agreement shall automatically terminate.

Except as modified by this Second Amendment, all defined terms used within this Amendment shall have the same meaning ascribed to them under the Consultation Agreement, all other terms and conditions of the Consultation Agreement shall remain in full force and effect. This Amendment may be executed in counterparts manually or by the application of digital or electronic signatures.

The Ohio State University

By: _____
Geoffrey S. Chatas
Senior Vice President for Business & Finance & CFO

Date: _12/16/2015_____

By: _____
Eugene Smith
Vice President and Director of Athletics

Date: _22-16-15_____

NIKE USA, Inc.

By: _____
Jonathan Banks
Vice President, North America Sports Marketing

Date: _12/16/15_____

By: _____
Its: _Executive Vice President Global Sports Marketing_

Date: _1-5-16_____

Fed. Id. No.: 31-6025986

2

### THE OHIO STATE UNIVERSITY
### EQUIPMENT SUPPLY AGREEMENT

THIS IS AN AGREEMENT effective August 1, 2007 and entered into as of the signature date set forth below by and between The Ohio State University at Columbus, on behalf of its Department of Athletics, having its principal administrative office at 410 Woody Hayes Drive, Room 224, St. John Arena, Columbus, Ohio 43201-2013 (hereinafter "UNIVERSITY"), and NIKE USA, Inc., an Oregon corporation having its principal offices at One Bowerman Drive, Beaverton, Oregon 97005-6453 (hereinafter "NIKE").

### W I T N E S S E T H

WHEREAS, UNIVERSITY fields and maintains nationally recognized athletic teams in numerous sports (and retains the coaches and staff in connection therewith), desires to obtain sponsors to support its Department of Athletics, and owns all right, title and interest in and to the names, nicknames, mascots, trademarks, service marks, logographics and/or symbols, and any other recognized reference to UNIVERSITY or its "Intercollegiate Athletic Programs" (as defined below);

WHEREAS, NIKE is a sports and fitness company engaged in the manufacture, distribution and sale of athletic and athleisure footwear, apparel and related accessories, and desires to support UNIVERSITY and its intercollegiate athletic programs as described below; and

WHEREAS, UNIVERSITY desires to acknowledge NIKE's support of the Department of Athletics as described below;

NOW, THEREFORE, in consideration of the mutual promises, terms and conditions set forth herein, it is agreed as follows:

1. DEFINITIONS.

As used in this Agreement, the terms set forth below shall be defined as follows:

(a) "BCS Bowl" shall mean, as of the date of execution hereof, any of the following bowl games: Orange Bowl, Sugar Bowl, Fiesta Bowl, and Rose Bowl; and shall also mean the fifth bowl game designated as the so-called college football "National Championship" game. In the event of a material change in the college football bowl structure, the parties shall meet in good faith and devise appropriate language to address the new system.

(b) "Coach" shall mean an individual employed by UNIVERSITY during the term of this Agreement to act as a head coach of an Intercollegiate Athletic Program.

(c) "Conference" shall mean the intercollegiate athletic conference of which UNIVERSITY is a member for the particular Team or Program at issue herein.

(d) "Contract Year" shall mean each consecutive twelve (12) month period from August 1 through July 31 during the term of this Agreement, including Option Years, if any.

(e) "Flagship Program(s)" shall mean any of the following Intercollegiate Athletic Programs: Football, Men's Basketball, and Women's Basketball.

(f) "Game" shall mean game, match, meet, test or such other competition reference as is appropriate to each individual sport.

(g) "Intercollegiate Athletic Program(s)" or "Program(s)" shall mean the 36 existing organized team and individual sports (plus cheerleading) sponsored by UNIVERSITY at its Columbus

campus and such other replacement or additional intercollegiate athletic programs as may be established at that campus from time-to-time during the term of this Agreement.

(h) "Intercollegiate Athletic Program Activities" shall mean all games, practices, exhibitions, scrimmages, team appearances, team photo sessions, UNIVERSITY- sponsored sports camps, and other Team-organized activities (including but not limited to photo shoots and interviews) during which Team members, Coaches, and Staff wear and/or use Products.

(i) "Material Acknowledgment Loss" shall mean the removal from Authentic Competition Apparel or footwear of camera-visible manufacturer identification (i.e., the NIKE name or the Swoosh Design) from its current placement location, or the adoption by a national television broadcaster of "virtual signage" applied to Flagship Program game broadcasts which either deletes or obscures manufacturer identification on such Products or replaces it with that of a third party. For purposes of this Agreement, "virtual signage" shall mean use of L-VIS technology or electronic/computer imaging technology that alters, substitutes or replaces NIKE's stadium/arena signage (including NIKE logo identification that appears on uniforms) with other commercial identification that is seen by home television viewers.

(j) "NCAA" shall mean the National Collegiate Athletic Association or the governing body with jurisdiction over intercollegiate competition in any specific sport.

(k) "NIKE" shall mean NIKE USA, Inc., its parent NIKE, Inc., and their licensees, distributors, subsidiaries, and any successor company(ies).

(l) "NIKE Products" shall mean all Products in connection with which, or upon which, the NIKE name, the Swoosh Design, the NIKE AIR Design, the Jumpman Design or any other trademarks or brands (e.g., Bauer, Starter) now or hereafter owned and/or controlled by NIKE (collectively, "NIKE Marks") appear.

(m) "Products" shall mean:

(1) all athletic and athletically inspired or derived footwear (specifically including hockey skates) that members of any Team, Coaches and/or Staff wear or may be reasonably expected to wear while participating in their respective Intercollegiate Athletic Program;

(2) authentic competition apparel consisting of uniforms, sideline or courtside jackets and sweaters, game-day warm-ups, basketball shooting shirts, football player capes, wool and fitted caps, windsuits, rainsuits, sideline or courtside pants, shorts and shirts, and similar apparel, and practicewear (collectively, "Authentic Competition Apparel") that members of any Team, Coaches and/or Staff wear or may be reasonably expected to wear while participating in their respective Intercollegiate Athletic Program;

(3) all other apparel articles of an athletic or athleisure nature including but not limited to tank-tops, T-shirts, sweatsuits, separates and other body coverings, and accessories of an athletic or athleisure nature, including but not limited to headwear, headbands, wristbands, bags, socks, hand-towels (not including Gatorade or other sport drink towels in the Teams' bench areas), receiver's and linemen's gloves, batting gloves, that members of any Team, Coaches and/or Staff wear or use or may be reasonably expected to wear or use while participating in their respective Intercollegiate Athletic Program; and

(4) sports equipment including, but not limited to, inflatable balls (specifically including without limitation basketballs and volleyballs); baseball bats and other baseball

equipment; softball equipment (excluding bats, fielding gloves, and catchers' equipment); hockey equipment; non-prescription protective eyewear, eyewear with performance attributes and sunglasses; sports timing devices (including wristwatches, race timers, stopwatches, etc. and devices used for competition or training that are also used in combination with timing devices such as heart-rate monitors or calorimeters; excluding golf clubs, but including such other equipment as NIKE may add to its product lines at any time during the term of this Agreement and subject to the provisions of Paragraph 13 below, provided that such Products shall meet UNIVERSITY's good faith requirements for quality.

(n)  "Staff" shall mean, collectively, all assistant coaches and strength coaches, equipment managers, trainers and any on-field/courtside staff (e.g., ballpersons) employed by UNIVERSITY during the term of this Agreement to provide services to Intercollegiate Athletic Programs.

(o)  "Team" shall mean that group of athletes attending the UNIVERSITY's Columbus campus during the term of this Agreement and comprising the roster of each Intercollegiate Athletic Program.

(p)  "Tier I Bowl" shall mean any of the following non-BCS Bowl games traditionally played on New Year's Day and such additional or replacement New Year's Day bowl games as may be established: the Citrus; Cotton; Gator; or Outback Bowl.

(q)  "UNIVERSITY Marks" shall mean the names, nicknames, mascots, trademarks, service marks, logographics and/or symbols, and any other recognized reference to UNIVERSITY or its Intercollegiate Athletic Programs.

(r)  "UNIVERSITY Web Site[s]" shall mean the official Internet World Wide Web site of the UNIVERSITY's athletic department, presently named <http://www.ohiostatebuckeyes.cstv.com>, and/or any other "official" web site designated as such by the UNIVERSITY's athletic department.  It is understood that <http://www.osu.edu> is not included in this definition.

2.  TERM.

This Agreement shall remain in full force and effect for a period of seven (7) Contract Years, from August 1, 2007 through July 31, 2014, unless extended as provided in Paragraph 12 (a) hereof or sooner terminated in accordance with the terms and conditions hereof (the "Term"). This Agreement shall be interpreted in its entirety and not as a series of one-year agreements.

3.  PRE-EXISTING COMMITMENT.

NIKE acknowledges that, subject to the exclusive wear and use obligations as set forth in Paragraph 7 below, UNIVERSITY, as a Conference member, is and may continue to be subject to an agreement between the Conference and a third party apparel manufacturer which requires the UNIVERSITY to use is best efforts to distribute "Big Ten Champion" logoed hats and t-shirts after the athletic contest which has determined that a UNIVERSITY team has won a Big Ten Championship.

4.  ACKNOWLEDGMENT.

UNIVERSITY hereby grants to NIKE, and NIKE hereby accepts, (i) the designation as "the official supplier of the athletic footwear and authentic apparel products of (designated Team)" and "the official athletic footwear and authentic apparel sponsor of (designated Team)", and/or such similar designations as shall be agreed upon by both parties (collectively, the

"Designations"), and (ii) the right to utilize (subject to the approval provisions of Paragraph 10 below and worldwide retail rights which have been granted by UNIVERSITY other than for Authentic Competition Apparel and certain other Products) the UNIVERSITY Marks (on a nonexclusive basis except as otherwise agreed by the parties in writing, herein or elsewhere) and/or Designations (on an exclusive basis) worldwide, in any media (now known or hereafter created) including, but not limited to, the Internet, the worldwide web, CD-ROM and other interactive and multi-media technologies, and programming, in connection with the manufacture, marketing and sale of NIKE Products and the marketing of the NIKE brand.

Such rights shall specifically include, but shall not be limited to, the exclusive right to supply Products for each Team and to use the Designations and, in connection therewith, the non-exclusive right to use game photographs, videotape and/or film footage of any and all Intercollegiate Athletic Programs subject to applicable NCAA rules and regulations with respect to the depiction of eligible athletes. (At NIKE's request, UNIVERSITY shall permit NIKE to utilize, consistent with this Paragraph 4, UNIVERSITY game photographs and footage, owned and/or controlled by UNIVERSITY, without a use fee, other than reasonable search and edit charges.)

5.  PRODUCT SUPPLY CONSIDERATION.

(a)  In consideration of the other provisions of this Equipment Supply Agreement, NIKE shall supply to UNIVERSITY NIKE Product for the use of the Intercollegiate Athletic Programs. NIKE's product supply obligations (calculated on the basis of suggested retail price) shall be as follows: 2007-2008 Contract Year (CY1): $2,215,000; 2008-2009 Contract Year (CY2): $2,215,000; 2009-2010 Contract Year (CY3): $2,315,000; 2010-2011 Contract Year (CY4): $2,315,000; 2011-2012 Contract Year (CY5): $2,415,000; 2012-2013 Contract Year (CY6): $2,415,000; 2013-2014 Contract Year (CY7): $2,515,000. In the event this Agreement is extended as provided in Paragraph 12 (a), NIKE's additional product supply obligations shall be as follows: 2014-2015 Contract Year (Option Year 1, or OY1): $2,515,000; 2015-2016 Contract Year (OY2): $2,615,000; 2016-2017 Contract Year (OY3): $2,615,000. Subject to availability and NIKE standard sales terms and conditions, UNIVERSITY may reallocate the mix of NIKE Product annually in a manner which, in its sole discretion, best meets Teams' or UNIVERSITY needs and advances the principles of gender equity, provided that UNIVERSITY shall allocate a reasonable amount of its product allotment to Flagship Programs in such a manner as to support the authenticity and exposure of similar retail products being marketed by NIKE.

The exact styles, sizes and delivery dates and, where appropriate, quantities of such NIKE Products shall be mutually determined by NIKE and UNIVERSITY (and subject to subparagraphs (1) and (2) below) for each Contract Year. UNIVERSITY may order and purchase additional quantities of the foregoing merchandise, or components thereof, from NIKE, or such local authorized dealer as NIKE may designate, at NIKE's published wholesale prices for those or comparable Products. In the event Ohio law prohibits UNIVERSITY's compliance with the foregoing sentence, then the parties shall consult prior to any purchase by UNIVERSITY from a non-NIKE source, and any non-NIKE Product purchased by UNIVERSITY from any source shall be subject to the same restrictions as non-NIKE items obtained pursuant to Paragraph 5(a)(1)(iii). All Product to be supplied by NIKE hereunder shall be delivered F.O.B. to UNIVERSITY. Only properly submitted orders from UNIVERSITY's Director of Athletics or any authorized representative of UNIVERSITY's Director of Athletics shall be filled by NIKE. All Authentic Competition Apparel supplied by NIKE to UNIVERSITY shall comply with NCAA performance specifications (e.g., size of numbers) and labeling requirements as they currently exist. UNIVERSITY shall be permitted

a maximum of $200,000 in carry-over of unordered annual allotments of merchandise, from one Contract Year to the next.

NIKE agrees to replace any defective or otherwise non-conforming Products at no expense to UNIVERSITY.

(1)     UNIVERSITY acknowledges that:

(i)     Annual product allotments shall be delivered to UNIVERSITY generally one (1) month prior to the start of the regular season practices for each Intercollegiate Athletic Program and that annual allotments must typically be ordered 9-12 months in advance of each season to ensure timely delivery.

(ii)     From time-to-time, NIKE may elect to obtain certain apparel or accessory Products to be supplied hereunder (such as football game jerseys and pants) from third parties, or to provide UNIVERSITY with a mutually agreeable allowance with which to purchase certain of such Products from third parties that have been approved by NIKE, which approval shall not be unreasonably withheld. In either case, such Products shall bear the NIKE Swoosh Design and/or other NIKE Marks (as designated by NIKE), consistent with NCAA rules and regulations.

(iii)     Certain NIKE sports equipment (that has been approved by UNIVERSITY as Product) and accessory products requested by UNIVERSITY for its use as required under this Agreement may, at the time of such request, not be commercially available and that NIKE's inability to provide such requested NIKE Product on such occasions shall not be deemed a violation or breach of this Agreement. In that event, until NIKE is able to supply them, UNIVERSITY may obtain such sports equipment or accessory products from a non-NIKE supplier, provided that any such item must be blank (no visible brand or indicia of origin) and no promotional benefit of any kind shall accrue to the source of such items.

(2)     If in any Contract Year UNIVERSITY requires any additional footwear and/or core basic apparel Products (e.g., T-shirts, shorts, fleece and socks) for use by any Team(s) in quantities greater than those provided hereunder, then UNIVERSITY shall purchase any and all such Products directly from NIKE, or such authorized NIKE dealer as designated by NIKE, and in no event shall UNIVERSITY purchase such Products from any third party. In the event Ohio law prohibits UNIVERSITY's compliance with the foregoing sentence, then the parties shall consult prior to any purchase by UNIVERSITY from a non-NIKE source, and any non-NIKE Product purchased by UNIVERSITY from any source shall be subject to the same restrictions as non-NIKE items obtained pursuant to Paragraph 5(a)(1)(iii). NIKE sale of such Products to UNIVERSITY shall be at NIKE published wholesale cost. In addition, UNIVERSITY shall be permitted to order other NIKE Products for use by any Intercollegiate Athletic Program(s) at NIKE's published wholesale cost, subject to availability.

(b)     During each Contract Year, Coaches, Staff, and select employees of the Athletic Department (in UNIVERSITY's discretion), shall be entitled to order NIKE Product for their personal use, up to an aggregate maximum amount (in terms of retail value) of $150,000. All NIKE Product hereunder must be ordered through the "NIKE by Mail" program, subject to procedures established by NIKE for such purpose. No carry-over of unordered annual

allotments of NIKE By Mail merchandise from one Contract Year to another shall be allowed.

(c) NIKE shall not be liable to UNIVERSITY, any Team member, Coach, or Staff for any injury or damage suffered from wearing or using NIKE Products, except such injury or damage resulting from NIKE's negligence.

6. NIKE SPONSOR BENEFITS.

(a) In return for NIKE's sponsorship of UNIVERSITY, each Contract Year, UNIVERSITY shall provide NIKE with the following benefits at no additional cost to NIKE except as otherwise indicated:

(1) NIKE shall receive tickets to home games (and neutral site games as indicated below) for each Intercollegiate Athletic Program in accordance with the following:

| PROGRAM | No. TICKETS |
| --- | --- |
| Football | 10 tickets |
| Bowl games | 10 + others if available |
| Basketball (M) | 10 |
| Basketball Tournament (M) | 8 + others if available |
| Basketball (W) | 10 |
| Basketball Tournament (W) | 8 |
| All Other Programs | 4 |

In addition to the foregoing, each Contract Year, NIKE shall receive: (i) fifty (50) tickets (in lieu of the above indicated 10 tickets) to one mutually agreed upon non Big-Ten Conference football game; and (ii) thirty (30) tickets (in lieu of the above indicated 10 tickets) to one mutually agreed upon non Big-Ten Conference men's basketball game, and thirty (30) tickets (in lieu of the above indicated 10 tickets) to one mutually agreed upon non Big-Ten Conference women's basketball game (collectively, "NIKE Game-day"). "Basketball Tournament" as used herein means every basketball tournament in which UNIVERSITY's basketball Programs participate. The UNIVERSITY shall use its best efforts to ensure that all tickets provided under the foregoing provisions shall be for best available seats. UNIVERSITY shall use best efforts to fulfill NIKE's requests for such additional quantities of tickets as it may reasonably request, such tickets to be best available.

(2) A full color bleed page of UNIVERSITY content in all game day programs shall be dedicated to acknowledging NIKE's sponsorship of the Intercollegiate Athletic Programs. Such content shall be subject to the approval of Nike and shall be an acknowledgement as that term is defined in Internal Revenue Code Section 513(i) and related regulations.

(3) Three (3) parking passes at all football and basketball games.

(4) A hospitality event for football and basketball NIKE Game-day ticket holders (which may include, for example, a welcome reception and/or tour of facilities) which shall

be pre-arranged with UNIVERSITY and subject to its prior facility commitments. Any catering costs shall be at NIKE's expense.

(5) Subject to applicable NCAA regulations, the opportunity to stage events and/or contests which are mutually agreed-upon before the appropriate season begins around designated home games/competitions, which events or contests may occur pre-game, during half-time or post-game. Such events and/or contests shall not contain comparative or qualitative descriptions of Nike's products, price information or other indications of savings or value about Nike's products, any message that otherwise endorses Nike's products or induces one to purchase or use Nike's products, or any message that causes Nike's payments to not be treated as "qualified sponsorship payments" as that term is defined in Internal Revenue Code Section 513(i) and related regulations. The parties recognize that UNIVERSITY is more familiar with such regulations than NIKE and it shall be UNIVERSITY's responsibility to exercise its right of approval to prevent this outcome. In this connection, the parties agree that all determinations regarding compliance with Internal Revenue Code Section 513(i) shall be made in the sole good-faith discretion of UNIVERSITY.

(6) Reasonable access to Intercollegiate Athletic Program Activities, where appropriate, and consistent with NCAA regulations, for the purpose of shooting game-action photographs, film or videotape footage and/or conducting and taping post-game interviews. Nike's usage of such photographs, footage, interviews, or film shall be subject to the advance approval of UNIVERSITY.

(7) NIKE shall be permitted, upon its reasonable request, to use mutually agreed upon UNIVERSITY facilities in connection with community based programs and events held by NIKE (such as its NIKE GO program). UNIVERSITY shall not provide program services or staff services for such programs and events; however, normal UNIVERSITY facility services (e.g. janitorial) and physical plant services (e.g. HVAC) shall be provided.

(8) In addition to the above, UNIVERSITY shall afford NIKE advance notice and the opportunity to consider participation in any and all additional sponsorship opportunities, in any media, made available by UNIVERSITY during the Term.

(9) At home varsity volleyball games, (x) upon request and at NIKE's own expense, NIKE shall have the right to have its name and/or logo appear on the net tape along with the words "Ohio State Volleyball," if not prohibited by applicable NCAA or Conference rules; and (y) NIKE shall have the right to provide a banner with NIKE's name and/or logo only (not to exceed three feet by seven feet in size) to be displayed courtside in a location to be mutually agreed by the parties.

(b) In addition to the foregoing, UNIVERSITY shall provide NIKE with program-specific in-stadium/arena signage opportunities, if available, at the applicable UNIVERSITY sponsor rate, on a basis no less favorable than similarly situated UNIVERSITY sponsors.

(c) (1) UNIVERSITY shall, and without limiting any other rights granted hereunder, make its best efforts to ensure that NIKE has the right to purchase or otherwise obtain advertising and/or other benefits on the UNIVERSITY Web Site[s] on a basis no less favorable than that offered to any third party for substantially similar benefits on the UNIVERSITY Web Site[s].

(2) In accordance with Ohio law, NIKE shall have the right to request, and UNIVERSITY

shall provide to NIKE, information about UNIVERSITY and its Intercollegiate Athletic Programs. Such information may include, but shall not necessarily be limited to, textual, photographic, or video materials which are copyrighted, owned or otherwise controlled by UNIVERSITY. Such information shall be provided on a timely basis and without a use fee, other than reasonable search and edit charges, if applicable. NIKE has the right to publish such information, and/or other editorial content which may be created by or for NIKE, relating to the UNIVERSITY and/or its Intercollegiate Athletic Programs, on NIKE's World Wide Web site(s), subject to applicable NCAA regulations. Nothing in this Agreement shall be deemed to confer upon NIKE any right to operate an "official" UNIVERSITY website.

(3)     UNIVERSITY shall utilize its approval rights and, if possible, appropriate contractual restrictions to ensure that no non-NIKE brand of Products secures advertising exposure on the UNIVERSITY Web Site[s] which could mislead any reasonable person to believe that such non-NIKE brand of Products has an official supplier relationship with UNIVERSITY. UNIVERSITY shall create a disclaimer, subject to NIKE's approval, to the effect that the manufacturer of such non-NIKE Products is not an official supplier to UNIVERSITY, and such disclaimer shall be attached to all UNIVERSITY Web Site advertising for all apparel, footwear, and sports equipment, except for such exceptions as are permitted by the terms of this Equipment Supply Agreement (e.g. Wilson footballs) during each Contract Year. The parties shall annually agree upon the list of such exceptions. Institutional advertising for any retail outlet operated by UNIVERSITY's Athletic Department shall not be subject to this restriction if it does not include advertising for any Products.

7.    USE OF NIKE PRODUCTS.

(a)    Throughout the Term, UNIVERSITY shall make NIKE Products available on an exclusive basis to each Intercollegiate Athletic Program, to be worn and/or used by Team members, Coaches and Staff during practices, games, exhibitions, clinics and UNIVERSITY-sponsored sports camps and other official, formal Team-organized activities (including but not limited to photo sessions and interviews) during which Team members, Coaches and Staff wear and/or use Products. UNIVERSITY shall require all Coaches and Team and Staff members to wear and/or use exclusively NIKE Products during such activities, except as otherwise expressly provided herein. Notwithstanding the foregoing, (i) NIKE acknowledges that in one or more cases a Team may be prohibited by Conference or NCAA rules from using NIKE-supplied balls during certain tournaments and away and neutral site competitions; and (ii) in the event (x) a Team member experiences medical issues relating to shoe fit or comfort in wearing NIKE footwear; *and* (y) UNIVERSITY provides notice thereof to NIKE, and UNIVERSITY and the affected Team member work diligently with NIKE to address the issue; *and* (z) even after sustained and diligent good faith efforts by UNIVERSITY and the Team member to work with NIKE, the Team member is unable to wear NIKE footwear due to a bona-fide medical condition as evidenced by a certification by the Team's physician; *then* such Team member shall be permitted to wear non-NIKE footwear provided all visible manufacturer's identification is taped over or otherwise covered so as to completely obscure such manufacturer's identification. NIKE acknowledges that any Coach's wearing of non-athletic footwear and apparel in connection with his or her official coaching duties, as appropriate, shall not constitute a breach of this Paragraph. If Nike is unable to provide Products which are necessary for a Team(s) and its Coaches and Staff, UNIVERSITY shall be permitted to wear non-NIKE products. In the

event any Team member requires eyewear with corrective lenses during games, practices, exhibitions, clinics, camps, and other Team activities, UNIVERSITY shall make first best-faith efforts to outfit such Team member with Nike eyewear suitable to support the required prescription, but if such efforts fail, such Team member may wear non-NIKE eyewear, provided that such non-NIKE eyewear is not from a brand associated with footwear. With regard to certain items of sports equipment which are very personal to the user (e.g. hockey goalie pads), the NIKE Sports Marketing field representative working with UNIVERSITY shall have the authority to grant exceptions to this exclusive use requirement, provided that any such exception must be expressly granted in writing, shall expire not later than the final game of the then-current season of the applicable sport, and shall not form or serve as any precedent for any future requested exception.

(b)    UNIVERSITY shall ensure that no Team member, Coach or Staff member shall:

    (1)    Alter or permit the alteration of any NIKE Product worn or used by them (except as permitted under Paragraph 7(a) above); or

    (2)    Wear any non-NIKE Products which have been altered to resemble NIKE Products.

(c)    UNIVERSITY shall ensure that during all Intercollegiate Athletic Program Activities no Team member, Coach or Staff member shall wear and/or use any athletic footwear, or other Products, manufactured by companies other than NIKE except as permitted under Paragraphs 5(a)(1) and 7(a) above.

(d)    UNIVERSITY acknowledges that "spatting" or otherwise taping, so as to cover any portion of the NIKE logo, the NIKE athletic shoes worn by members of the Teams during Intercollegiate Athletic Program Activities, except as permitted in Paragraph 7(a) above, is inconsistent with the purpose of this Agreement and the benefits to be derived from it by NIKE and is a material breach of this Agreement, and shall subject UNIVERSITY to possible reductions as provided in Paragraph 8(d).

(e)    UNIVERSITY shall not permit the trade name, trademark, name, logo or any other identification of any person, company or business entity other than NIKE, or UNIVERSITY if approved by NIKE, to appear on NIKE Products worn or used by Coaches, Staff or Team members except for the name or logo of a bowl sponsor (but subject to Paragraph 24(a) below) if required for bowl participation, or a reasonable size commemorative identification to pay tribute to a significant particular UNIVERSITY team or notable UNIVERSITY or other figure (e.g., an anniversary patch or a mourning device) and provided such addition does not displace or cover any NIKE identification.

(f)    UNIVERSITY agrees that it will use exclusively NIKE volleyballs in the women's varsity volleyball program throughout the term of this Equipment Supply Agreement. NIKE acknowledges that as of the date of execution hereof NIKE does not offer a volleyball which can be used by UNIVERSITY's men's volleyball team in compliance with current men's volleyball rules and regulations. NIKE further acknowledges that UNIVERSITY's men's volleyball conference, MIVA, currently has an agreement with Molten, which requires that Molten volleyballs be used for all Conference games. Therefore, as of the date hereof it is not a breach of this Equipment Supply Agreement for UNIVERSITY's men's volleyball team to use Molten volleyballs. However, UNIVERSITY shall not grant sponsorship or publicity benefits to Molten or any other brand of volleyball. If, during the Term of this Agreement NIKE offers a volleyball which conforms to applicable requirements for men's collegiate volleyball, and provided that such NIKE volleyball meets UNIVERSITY's good-

faith requirements for quality, then UNIVERSITY's men's volleyball team will use exclusively NIKE volleyballs for practice and competition to the extent not prohibited by Conference agreements.

8.  CASH CONSIDERATION.

   (a)  Each Contract Year NIKE shall pay UNIVERSITY Base Compensation in the amounts provided below in two (2) equal semi-annual installments to be made on January 1 and June 1 of each Contract Year (and subject to subparagraph (b) below), to be used at UNIVERSITY's discretion. These amounts are subject to increase in accordance with the terms of Paragraph 13 and are also subject to reduction as provided herein.

   | | | | |
   |------|------------|------|------------|
   | CY1 | $1,188,000 | CY5 | $1,188,000 |
   | CY2 | $1,188,000 | CY6 | $1,188,000 |
   | CY3 | $1,188,000 | CY7 | $1,188,000 |
   | CY4 | $1,188,000 | | |

   In the event this Agreement is extended by NIKE as provided in Paragraph 12 (a), NIKE shall pay Base Compensation in these amounts during the option years:

   | | | | |
   |------|------------|------|------------|
   | OY1 | $1,488,000 | OY3 | $1,488,000 |
   | OY2 | $1,488,000 | | |

   (b)  UNIVERSITY acknowledges that two of the principal inducements for NIKE's entrance into this Agreement are (i) the wide-spread national television and other media exposure that the Flagship Programs annually receive, and (ii) the accompanying acknowledgment of NIKE sponsorship through the placement of the NIKE logo, as it currently appears (in terms of size, location placement, color prominence and/or numerosity), on Authentic Competition Apparel and that such continued acknowledgment is of the essence of this Agreement. Accordingly, if in any Contract Year there is a Material Acknowledgment Loss or a Flagship Program is banned from television appearances, in lieu of NIKE's exercise of its termination right under Paragraph 15 below, then for such Contract Year NIKE shall have the right to reduce UNIVERSITY's scheduled Base Compensation in accordance with the following:

   | PROGRAM | TV APPEARANCE BAN % REDUCTION |
   |---------|-------------------------------|
   | Football | 50% |
   | Basketball (M) | 20% |
   | Basketball (W) | 10% |

   (c)  If NIKE's logo placement rights are diminished in any manner other than as the result of a Material Acknowledgment Loss, NIKE shall have the right to a reasonable equitable reduction in scheduled Base Compensation to be paid UNIVERSITY going forward taking into account the nature and extent of the diminution of such logo rights, the amount of such reduction to be negotiated by the parties in good faith. If the parties cannot agree upon the

amount of a reasonable equitable adjustment, the parties shall submit the matter to non-binding arbitration in accordance with the provisions of Paragraph 18(b) below.

(d)    UNIVERSITY further acknowledges that (i) a third principal inducement for NIKE's entrance into this Agreement is the exposure that the NIKE brand receives through the prominent visibility of the NIKE Swoosh Design logo (or other NIKE logo) that appear on the side (and other locations) of the football shoes worn by members of the football team, (ii) such continued brand exposure is of the essence of this Agreement, and (iii) the "polishing-out", "spatting" or taping of football shoes in any manner so as to cover or obscure any externally visible portion of any shoe is inconsistent with the purpose of this Agreement and the expected benefits to be derived from it by NIKE and is a material breach of this Agreement (other than as specifically permitted under Paragraph 7[a] above). Accordingly, if members of the football team shall polish-out, spat, or otherwise tape their NIKE footwear, in lieu of NIKE's exercise of its termination right under Paragraph 15 below, NIKE in its sole discretion shall have the right to reduce UNIVERSITY's annual scheduled Base Compensation (for the Contract Year in which such polishing-out, spatting or taping occurs) as follows:

(1)    For each and any game in which five (5) or more players' shoes appear on-field (in game action) polished-out, spatted, or taped for any reason (including as permitted under Paragraph 7[a] above) [e.g., if both of a player's shoes are spatted then that counts as two such appearances], NIKE shall have the right to reduce UNIVERSITY's annual scheduled Base Compensation by one percent (1%) per shoe (in excess of five shoes) that has been so polished out, spatted or taped, up to a maximum of five percent (5%) per game.

(2)    For each player that shall appear on-field (in game action) with polished-out, spatted, or taped footwear in any season for any reason (other than as specifically permitted under Paragraph 7[a] above) after NIKE has provided UNIVERSITY with written notice of such occurrence by such player, NIKE shall have the right to reduce UNIVERSITY's annual scheduled Base Compensation by two percent (2%) for the next occurrence following such notice, and an additional two percent (2%) for each occurrence by such player thereafter.

(e)    Notwithstanding the foregoing, in the event any UNIVERSITY football player sustains a foot or ankle injury during a game, and UNIVERSITY's football trainer determines in the good faith exercise of the trainer's professional judgment that the player can continue to play in the game only if the player's ankle and shoe are taped, then that player's injured foot shall not count as a taped foot for the duration of the game in which the injury was incurred.

(f)    In the addition to the Base Compensation set forth above, NIKE shall pay UNIVERSITY cash bonuses as set forth on Schedule A for each of the indicated performance bonus(es) achieved by the indicated Team for any Contract Year, such bonus(es) to be paid within thirty (30) days of NIKE's receipt of written notification from UNIVERSITY that such bonus(es) has been earned.

(g)    In the event UNIVERSITY adopts any NIKE Products as new Products during the term hereof, and in so doing ends a relationship under which UNIVERSITY had received cash consideration for its use of such non-NIKE Products in the past, UNIVERSITY's Base Compensation hereunder shall be increased in accordance with the provisions of Paragraph 13.

9.     STUDENT INTERNSHIP.

     In addition to the product support and cash compensation set forth above, NIKE shall fund a paid internship at NIKE's World Headquarters as part of NIKE'S "Adrenaline" internship program for one (1) UNIVERSITY student during each summer this Agreement is in effect. UNIVERSITY shall advertise the availability of the internship and shall pass along to NIKE the information provided by applicants responding to the advertising, but shall have no other influence upon the selection. Selection of the UNIVERSITY intern shall be made in NIKE's sole discretion and in keeping with NIKE's determination of the required qualifications.

10.    APPROVALS OF TRADEMARK USE.

  (a)  In the event NIKE desires to use the UNIVERSITY's acknowledgment of its sponsorship in any consumer message, NIKE shall first submit a sample or the concept of the proposed message to UNIVERSITY for approval, which approval shall not be unreasonably withheld. Without limiting other examples of the possible reasonable withholding of approval, UNIVERSITY's disapproval of NIKE's concept shall be deemed reasonable if such concept includes a qualitative description of a NIKE Product, price information about a NIKE Product, or any message that otherwise endorses a NIKE Product as such term is interpreted in Section 513(i) of the Internal Revenue Code and related regulations. The parties recognize that UNIVERSITY is more familiar with such regulations than NIKE and it shall be UNIVERSITY's responsibility to exercise its right of approval to manage this potential issue.

     UNIVERSITY shall use its best efforts to advise NIKE of its approval or disapproval of the sample or concept within five (5) business days of its receipt thereof. UNIVERSITY's approval, or disapproval, shall be in writing. (If a submission is disapproved, UNIVERSITY's written notice thereof shall set forth in reasonable detail the basis for such disapproval.) Once a submitted sample or concept is approved, NIKE shall not depart therefrom without re-submission of the item and obtaining UNIVERSITY's further approval.

  (b)  In the event UNIVERSITY desires to use the NIKE Marks in any advertising or promotion, UNIVERSITY shall first submit a sample or the concept of the proposed advertisement or promotion to NIKE for approval, which approval shall not be unreasonably withheld.

11.    TRADEMARK OWNERSHIP.

  (a)  NIKE recognizes the value of the UNIVERSITY Marks and acknowledges that the goodwill attached thereto belongs to UNIVERSITY and that nothing in this Agreement serves to assign, convey or transfer to NIKE any rights, title or interest in or to the UNIVERSITY Marks.

  (b)  UNIVERSITY recognizes the value of the NIKE Marks and acknowledges that the goodwill attached thereto belongs to NIKE and that nothing in this Agreement serves to assign, convey or transfer to UNIVERSITY any rights, title or interest in or to the NIKE Marks.

12.    NIKE OPTION AND RIGHT OF FIRST REFUSAL.

  (a)  NIKE shall have an option to extend this Agreement for an additional term of three (3) Contract Years on the same terms and conditions (except as expressly provided herein) by giving notice to UNIVERSITY not later than February 1, 2013.

  (b)  If any branch-campus of UNIVERSITY ("Branch School") fields and maintains a Division I team that seeks an exclusive Product supplier, NIKE shall have the right of first refusal to

obtain such additional rights as follows: UNIVERSITY shall meet with NIKE (or arrange for NIKE to meet with the appropriate authorities if such rights are not exclusively controlled by UNIVERSITY) to discuss in good faith the granting of such rights to NIKE. Such discussions must occur prior to Branch School engaging in negotiations with any manufacturer or distributor of Products other than NIKE. The parties shall not be obligated to enter into an agreement if they cannot settle on mutually satisfactory terms. If good faith negotiations with NIKE do not result in the consummation of an agreement, UNIVERSITY shall, thereafter, notify NIKE in writing of any bona fide third party offer that Branch School receives during the Term for such rights, and shall submit to NIKE in writing the specific terms of such bona fide third party offer, at least fifteen (15) business days prior to entering into an agreement with such third party. If NIKE agrees to match or better the material, measurable and matchable terms of such third party offer within such fifteen (15) business day period, Branch School agrees to enter into a contract with NIKE on the terms of the offer made by NIKE. If NIKE fails or declines to match or better the material, measurable and matchable terms of such third party offer within such fifteen (15) business day period, Branch School may enter into a contract with the third party on the terms of the offer not matched by NIKE.

(c)     Prior to February 1, 2013 (or February 1, 2016 if this Agreement has been extended by NIKE as provided in Paragraph 12 [a]) (in either case, the "Negotiating Date"), UNIVERSITY shall not engage in discussions or negotiations (nor shall UNIVERSITY permit its agents, attorneys or representatives to do so) with any third party regarding equipment supply for UNIVERSITY with respect to any Products, or sponsorship of any UNIVERSITY Intercollegiate Athletic Program (or similar supply or promotional arrangement) with respect to any Products ("Product Supply/Sponsorship Rights") after the Term. It is understood that UNIVERSITY may become aware of third party items which may be of some utility to the Intercollegiate Athletic Programs and nothing in this subparagraph 12(c) shall prohibit or bar UNIVERSITY from adopting, or discussing or negotiating the adoption of, such items, provided that such items are not Products, and otherwise subject to the provisions hereof.

(d)     During the Term and for a period of one hundred eighty (180) days thereafter, NIKE shall have the right of first refusal for Product Supply/Sponsorship Rights as defined herein, as follows. If UNIVERSITY receives any bona fide third-party offer at any time on or after the Negotiating Date with respect to any Product Supply/Sponsorship Rights, UNIVERSITY shall submit to NIKE in writing the specific terms of such bona fide third-party offer. NIKE shall have fifteen (15) business days from the date of its receipt of such third-party offer to notify UNIVERSITY in writing if it will enter into a new contract with UNIVERSITY on terms no less favorable to UNIVERSITY than the material, measurable and matchable terms of such third-party offer. If NIKE so notifies UNIVERSITY within such 15-day period, UNIVERSITY shall enter into a contract with NIKE on the terms of NIKE's offer. If NIKE fails or declines to match or better the material, measurable and matchable terms of such third-party offer within such 15-day period, UNIVERSITY may thereafter consummate an agreement with such third party on the terms of the offer made to UNIVERSITY. Prior to the Negotiating Date, UNIVERSITY shall not solicit, consider or present to NIKE, and NIKE shall not be obligated to respond to, any third-party offer for any Product Supply/Sponsorship Rights.

13. RIGHTS FOR NEW PRODUCTS.

From time-to-time during the term of this Agreement, NIKE may add to its Products line one or more items of sports equipment. If at any time during the Term NIKE shall have a bona fide intention to expand its Products line by adding any such item(s), then NIKE shall give UNIVERSITY six (6) months' advance written notice of the particular item(s) then in development by NIKE. Once such item is commercially available and of sufficient good quality to meet UNIVERSITY's reasonable requirements, then such item(s) shall thereafter be deemed to be included in "Products" as defined in Paragraph 1(l) above and "NIKE Products" as defined in Paragraph 1(k) above and covered in all pertinent respects by the terms hereof and UNIVERSITY shall no longer be permitted to source such Products from a manufacturer other than NIKE. Thereafter, UNIVERSITY shall make such new Product item(s) available to Team members, Coaches and/or Staff members, NIKE shall supply UNIVERSITY, free of charge, with sufficient quantities for such purpose to be mutually agreed upon by the parties, including quantities equal to or greater than the quantities of any comparable item(s) which UNIVERSITY, Team members, Coaches and/or Staff members are then receiving from a third party, and UNIVERSITY shall thereupon distribute, as is appropriate, such new item(s) to Team members, Coaches and/or Staff members for use pursuant to the terms of this Agreement. Such quantities of the new Product item(s) shall be in addition to the Product Supply Consideration provided in Paragraph 5(a). In addition, if UNIVERSITY's former source for such new Product item(s) had been paying annual cash consideration to UNIVERSITY in consideration of UNIVERSITY's use of such new Product item(s), NIKE shall match that amount annually for the duration of this Equipment Supply Agreement. Such additional Base Compensation shall be paid in the same manner and on the same schedule provided in Paragraph 8(a).

14. RIGHT OF TERMINATION BY UNIVERSITY.

UNIVERSITY shall have the right to terminate this Agreement immediately upon written notice to NIKE if:

(a) NIKE is adjudicated insolvent or declares bankruptcy;

(b) NIKE fails to make payment to UNIVERSITY of any sum due pursuant to this Agreement within thirty (30) days following NIKE's receipt of written notice from UNIVERSITY that such payment is past due; or

(c) NIKE breaches any other material provision of this Agreement, which breach NIKE fails to cure within thirty (30) days of NIKE's receipt of written notice from UNIVERSITY specifying the breach.

15. RIGHT OF TERMINATION BY NIKE.

(a) NIKE shall have the right to terminate this Agreement immediately upon written notice to UNIVERSITY if:

(1) Any Flagship Program is placed on NCAA probation which results in a television or post-season appearance ban for longer than a single playing season, or UNIVERSITY ceases for any reason to field a Division I team in any of the Flagship Programs;

(2) Members of any Team fail to wear or use NIKE Products during practices, games, exhibitions, clinics, UNIVERSITY-sponsored sports camps or other official, formal Team-organized occasions during which Team members wear or use Products (including but not limited to photo sessions and interviews), or wear NIKE Products

altered, spatted or taped, in violation of the provisions of Paragraph 7 above; provided, however, that NIKE shall have first provided written notice to UNIVERSITY of any such violation and such violation shall then recur during the same Contract Year;

(3) Any Coach, Staff or Team member fails to perform any material obligations provided for in this Agreement;

(4) UNIVERSITY, the NCAA, the Conference or any assignee thereof (including any licensing agent or broadcast partner of the foregoing) enacts, adopts or accedes to any regulation, restriction, prohibition or practice that results in a Material Acknowledgment Loss;

(5) Athletic Department administration, Coaches or Staff disparages the quality or performance of NIKE Products or the brand; or

(6) UNIVERSITY breaches any warranty or other material term of this Agreement, which breach UNIVERSITY fails to cure, if curable, within thirty (30) days of NIKE's delivery of written notice to UNIVERSITY of any such breach.

(7) In the event of the termination (for any reason) of any other agreement between the parties, if any such agreements shall exist at the time; or

(8) In the event any third party which is engaged in the manufacture, branding, selling, or marketing of Products becomes a "sponsor" in violation of the terms of Paragraph 24[a] below, or an advertiser on the UNIVERSITY Web Site in violation of the provisions of Paragraph 6(c)(3) above, with the understanding that termination under this Paragraph 15(a)(8) will not be effective until the end of the then-current Contract Year.

(b) In the event of termination under this Paragraph or Paragraph 14, UNIVERSITY shall not be entitled to any further compensation under this Agreement, except any unpaid Base Cash Compensation and Performance Bonuses earned prior to the effective date of termination, pro-rated (in the case of Base Cash Compensation) over the entire Contract Year and calculated to the effective date of termination. Alternatively, NIKE shall have the right to receive from UNIVERSITY reimbursement for Base Cash Compensation, if any, paid in excess of the amount to which UNIVERSITY would be entitled if the Base Cash Compensation were pro-rated over the entire Contract Year, calculated to the effective date of termination. Any such payment shall be due within thirty (30) days of the date of termination.

16. NIKE POST-TERMINATION RIGHTS.

Upon expiration or termination of this Agreement for any reason, NIKE shall have the right to:

(a) Run any non-cancelable media involving the UNIVERSITY Marks and exhaust all materials which were produced prior to the effective date of expiration or termination; and

(b) Use, in perpetuity, Game Photos or Game Footage for NIKE in-house exhibition for historical, educational or commemorative purposes but not for sale or other promotional or commercial purposes.

17. INDEMNIFICATION.

NIKE shall defend, indemnify and hold harmless UNIVERSITY, its Board of Trustees, directors, officers, employees and agents (collectively, "UNIVERSITY Parties") from and against all suits,

actions, claims, judgments, damages, losses or other liabilities, and all costs and expenses, including reasonable attorney fees, ("Claims") incurred by any UNIVERSITY Parties in connection therewith, arising out of or relating to NIKE's: (i) breach of any material term of this Agreement; or (ii) acts or omissions of NIKE, or those of its employees and/or agents; provided NIKE is given prompt written notice of and shall have the option to undertake and conduct the defense of any such Claim (subject to the Ohio Attorney General's statutory authority to appoint legal counsel with respect to UNIVERSITY and approve settlements with respect to UNIVERSITY). In any instance to which the foregoing indemnities pertain, UNIVERSITY Parties shall cooperate fully with and assist NIKE in all respects in connection with any such defense, and no UNIVERSITY Party shall enter into a settlement of such Claim or admit liability or fault on the part of NIKE without NIKE's prior written approval. With respect to Internal Revenue Code Section 513(i) and related regulations, it shall be UNIVERSITY's responsibility to exercise its rights of approval over messages for and about NIKE to ensure that NIKE's payments hereunder are treated as "qualified sponsorship payments." Provided that NIKE complies with all of the approval requirements herein for sponsorship recognition and other messaging, NIKE shall not bear any responsibility for any finding by the Internal Revenue Service which results in the payment of more tax by UNIVERSITY.

18.    REMEDIES.

(a)    UNIVERSITY and NIKE agree that, in the event that either party breaches any material term or condition of this Agreement, in addition to any and all other remedies available to the non-breaching party at law or in equity, the non-breaching party shall be entitled to seek injunctive relief from such further violation of this Agreement, pending litigation as well as on final determination of such litigation, without prejudice to any other right of such other party.

(b)    Any dispute between the parties relating solely to the amount of a reduction to which NIKE shall be entitled pursuant to Paragraph 8(c) above shall be subject to non-binding arbitration under the Dispute Resolution Rules of the American Arbitration Association (the "AAA") then in effect. Such arbitration proceeding shall take place in Chicago, Illinois (unless otherwise agreed) before a single mutually agreed arbitrator who shall be a lawyer. If UNIVERSITY and NIKE cannot agree upon the choice of the arbitrator within ten (10) days of the date the matter is submitted for arbitration, the parties shall request, and accept, assignment of an arbitrator by the AAA. Any arbitration proceeding and decision shall be private and confidential, to the extent permitted under Ohio law.

19.    NOTICES.

All notices, statements and payments provided for herein shall be in writing and deemed given if sent postage prepaid via registered or certified mail, or by express courier service, to the parties at the addresses given below, or such other addresses as either party may designate to the other. Any written notice shall be deemed to have been given at the time it is sent addressed to the parties as set forth below. It is UNIVERSITY's obligation to notify NIKE of any address change.

| NIKE, Inc.<br>One Bowerman Drive<br>Beaverton, OR 97005-6453<br>Attn: Director of Sports Marketing, U.S. | The Ohio State University<br>Dept. of Athletics<br>410 Woody Hayes Drive, Rm. 224<br>Columbus, OH 43210-1166<br>Attn: Senior Associate Athletic Director for Finance & Operations |
|---|---|
| cc: Legal Dept., Contracts Administrator (on any notice of breach) | cc: Attn: Office of Legal Affairs, Julie D. Vannatta (on any notice of breach)<br>AS OF DATE OF EXECUTION HEREOF:<br>33 West 11th Avenue, Suite 209<br>Columbus, OH 43201-2013<br>EFFECTIVE MARCH 2007:<br>1590 North High Street, Suite 500<br>Columbus, OH 43201-2178 |
| | (on any notice of breach arising out of any breach of Paragraph 8[d])<br><br>cc: Director of Athletics<br>410 Woody Hayes Drive, Rm. 224<br>Columbus, OH 43210-1166<br><br>*and*<br><br>cc: Head Football Coach<br>2491 Olentangy River Road<br>Columbus, OH 43210-1073 |

20.    RELATIONSHIP OF PARTIES.

The performance of services for NIKE by UNIVERSITY is in the capacity of independent contractors. Accordingly, nothing contained in this Agreement shall be construed as establishing an employer/employee, partnership or joint venture relationship between UNIVERSITY and NIKE.

21.    ASSIGNMENT/DELEGATION/PASS THROUGH.

(a)    This Agreement and the rights and obligations of UNIVERSITY hereunder are personal to UNIVERSITY and shall not be assigned or delegated by UNIVERSITY. Any assignment by UNIVERSITY shall be invalid and of no force or effect and upon any such unauthorized assignment, NIKE may, at its option, immediately terminate this Agreement upon written notice to UNIVERSITY.

(b)    The rights granted to NIKE by UNIVERSITY hereunder are personal to NIKE and shall not be assigned, delegated or passed-through outside of NIKE and its retail accounts without UNIVERSITY's prior approval, which approval shall not be unreasonably withheld.

22. **WAIVER.**

The failure at any time of UNIVERSITY or NIKE to demand strict performance by the other of any of the terms, covenants or conditions set forth herein shall not be construed as a continuing waiver or relinquishment thereof, and either party may, at any time, demand strict and complete performance by the other party of such terms, covenants and conditions.

23. **SEVERABILITY.**

Every provision of this Agreement is severable. If any term or provision hereof is held to be illegal, invalid or unenforceable for any reason whatsoever, such illegality, invalidity or unenforceability shall not affect the validity of the remainder of this Agreement or any other provision and the illegal, invalid or unenforceable provision shall be deemed by the parties as replaced by such substitute provision as shall be drafted by NIKE and approved by UNIVERSITY, in such form and substance as shall be legally valid, and as shall accomplish as near as possible the purpose and intent of the invalidated provision.

24. **ADDITIONAL WARRANTIES.**

UNIVERSITY represents and warrants that:

(a)   Neither UNIVERSITY nor any Coach nor Staff member is party to any oral or written agreement, contract or understanding which would prevent, limit or hinder the performance of any obligations hereunder of UNIVERSITY, Coaches or Staff. UNIVERSITY further represents and warrants that during the term hereof UNIVERSITY will not (except as provided under Paragraph 5(a) and 7(a) above), without the prior written consent of NIKE:

(1)   In connection with any Intercollegiate Athletic Program, enter into any endorsement, product supply, promotional, consulting or similar agreement (including the sale of signage or other media) with any person or entity who manufactures, sells, fulfills or otherwise distributes Products (via the Internet or otherwise) other than NIKE. Notwithstanding the foregoing, it shall not be a breach of this Equipment Supply Agreement for UNIVERSITY to utilize Wilson branded footballs so long as the Wilson Sporting Goods Company continues to manufacture all footballs used by UNIVERSITY within the State of Ohio. NIKE recognizes that as of the date of this Equipment Supply Extension Agreement, UNIVERSITY has agreements in place with five (5) retail sponsors who are sellers of Products: Value City / Schottenstein Stores, American Eagle Outfitters, Dick's Sporting Goods, Kroger, and Designer Shoe Warehouse ("Existing Agreements With Sellers Of Products"), and agrees that the Existing Agreements With Sellers of Products may remain in effect until the expiration of the current term of each such agreement, including any renewal term which is currently a part of such agreement. In the event any of the five (5) Existing Agreements With Sellers of Products expires or is terminated, UNIVERSITY shall have the right to replace such retail sponsor with another, who may also be a seller of Products ("Future Agreement[s] With Sellers of Products"), subject to the provisions hereof. UNIVERSITY shall not at any one (1) time have more than five (5) retail sponsors who are sellers of Products. UNIVERSITY agrees that to the extent it has approval rights, it shall not approve any advertising or promotional materials under any such Existing or Future Agreements With Sellers of Products if such advertising or promotional materials feature or promote any footwear or apparel Products, or brand of footwear or apparel Products, other than NIKE (e.g., UNIVERSITY would not approve any Kroger advertisement featuring Puma athletic footwear). NIKE further

agrees that it shall not be a breach of this Agreement for UNIVERSITY to own and operate retail outlets, including without limitation "The Official Team Shop," which may receive signage and promotional benefits in UNIVERSITY's discretion so long as such outlet(s) continue to sell a reasonable selection of NIKE Products;

(2) Allow any Coach or Staff member of any Intercollegiate Athletic Program to, in violation of this Agreement, wear and/or use Products sold by any person or entity who manufactures, sells, fulfills or otherwise distributes Products (via the Internet or otherwise) other than NIKE or enter into any endorsement, product supply, promotional, consulting or similar agreement with any person or entity who manufactures, sells, fulfills or otherwise distributes Products (via the Internet or otherwise) other than NIKE;

(3) In connection with any Coach- or UNIVERSITY-operated and/or licensed sports camp, enter into or allow any Coach or Staff member of any Intercollegiate Athletic Program to enter into any endorsement, product supply, promotional, consulting or similar agreement (including the sale of signage or other media) with any person or entity who manufactures sells, fulfills or otherwise distributes Products (via the Internet or otherwise) other than NIKE (with the understanding that for camps associated with non-Flagship Programs, UNIVERSITY may sell or distribute non-NIKE t-shirts that bear no external brand identification, and that internal brand identification shall be permissible only if the brand is not associated with footwear);

(4) Sell to any person or entity Products purchased or provided hereunder by NIKE or any third-party, provided that it shall not be a violation of this Agreement for UNIVERSITY, on an occasional basis, to offer to sell to the public its used Products, or Products which in good faith it no longer contemplates using for the purposes of this Agreement; or

(5) Permit the trade name, trademark, name, logo or any other identification of any manufacturer or seller of Products other than NIKE to appear on signage at home practices, games, exhibitions, clinics, UNIVERSITY-sponsored sports camps, and other official or UNIVERSITY sanctioned Intercollegiate Athletic Program Activities which are controlled by UNIVERSITY.

(6) Approve use by any third-party of any game photographs or footage in which NIKE Marks that appear on Products worn and/or used by a Team member, Coach or Staff have been airbrushed, digitally altered or otherwise obscured.

(b) It has the full legal right and authority to enter into and fully perform this Agreement in accordance with its terms and to grant to NIKE all the rights granted herein.

25. CONFIDENTIALITY.

UNIVERSITY shall not (nor shall it permit or cause its employees, agents or representatives to) disclose the financial terms of this Agreement, the marketing plans of NIKE, or other confidential material or information disclosed to UNIVERSITY (including information disclosed during audit), to any third party, except to its trustees or as may be required by law.

26. CAPTIONS.

Paragraph captions and other headings contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of the Agreement or any provision hereof.

27.   CONTRACT CONSTRUCTION.

Notwithstanding any provision contained heretofore in this Agreement, the provisions of this Agreement shall be construed in a manner consistent with the intentions of UNIVERSITY and NIKE that all amounts received under this Agreement are qualified sponsorship payments as that term is defined in Section 513(i) of the Internal Revenue Code and related regulations. Consistent with that intent, nothing produced by NIKE under this Agreement shall contain: qualitative or comparative language; price information or other indication of savings or value associated with a product or service; a call to action; an endorsement or an inducement to buy, sell, rent or lease NIKE Products or services.

28.   ENTIRE CONTRACT.

As of the effective date hereof, this Agreement shall constitute the entire understanding between UNIVERSITY and NIKE with regard to the specific subject matter hereof and may not be altered or modified except by a written agreement, signed by both parties. Any previous agreements between UNIVERSITY and NIKE with regard to the specific subject matter hereof shall have no further force or effect after July 31, 2007.


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.


THE OHIO STATE UNIVERSITY

By: _William J. Shkurti_
William J. Shkurti
Senior Vice President for Business & Finance

Fed. Id. No: _31-602-5986_

By: _[signature]_
Eugene D. Smith
Director of Athletics


NIKE USA, Inc.

By: _[signature]_
Kit Morris
Director of College Sports Marketing

By: _Adam S. Helfant_
Adam Helfant
Vice President, Global Sports Marketing
Dated: _11/18/06_

## SCHEDULE A

|  | FOOTBALL | BASKETBALL (M) | BASKETBALL (W) |
|---|---|---|---|
| National Championship | $10,000 | $25,000 | $7,500 |
| Conference Championship | $ 5,000 | $10,000 | $5,000 |
| BCS Bowl Appearance | $ 2,500 | N/A | N/A |
| Tier I Bowl Appearance | $ 2,000 | N/A | N/A |
| Top 5 Ranking[1] | $ 3,500 | $ 3,500 | $3,000 |
| .950 Season Winning % | $ 3,500 | $ 3,500 | $3,000 |

[1]  Based on final USA Today or AP Final Poll (whichever is higher)

## FIRST AMENDMENT TO EQUIPMENT SUPPLY AGREEMENT

On November 18, 2006, The Ohio State University ("OSU") and NIKE USA, Inc. ('NIKE") entered into an equipment supply agreement (the "Agreement").  The parties hereby desire to modify such Agreement as follows:

1) Paragraph 1(m)(4) is deleted in its entirety and restated as follows:

> (4) sports equipment including, but not limited to, inflatable balls (specifically including without limitation basketballs and volleyballs); baseball bats and other baseball equipment; softball equipment (excluding bats, fielding gloves, and catchers' equipment); hockey equipment; non-prescription protective eyewear, eyewear with performance attributes and sunglasses; sports timing devices (including wristwatches, race timers, stopwatches, etc. and devices used for competition or training that are also used in combination with timing devices such as heart-rate monitors or calorimeters; excluding golf clubs and golf balls, but including such other equipment as NIKE may add to its product lines at any time during the term of this Agreement and subject to the provisions of Paragraph 13 below, provided that such Products shall meet UNIVERSITY's good faith requirements for quality.

Except as expressly modified above, the Agreement remains in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Addendum on the dates written below.

THE OHIO STATE UNIVERSITY               NIKE USA, Inc.


William J. Shkurti                               Kit Morris
Senior Vice President                          Director of College Sports Marketing
for Business and Finance

Date: 7/23/07                                    Date: 8.3.07


Eugene D. Smith                               Adam Helfant
Director of Athletics                           Vice President, Global Sports Marketing

Date: 7-11-07                                   Date: 8/20/07

## SECOND AMENDMENT TO EQUIPMENT SUPPLY AGREEMENT

On November 18, 2006, The Ohio State University ("OSU") and NIKE USA, Inc. ("NIKE") entered into an equipment supply agreement (the "Agreement"), which Agreement was amended on August 20, 2007. The parties hereby agree to further amend and modify the Agreement as follows:

(1) Paragraph 1(m)(1) is deemed amended to delete hockey skates.

(2) Paragraph 1(m)(2) is deemed amended to exclude competitive technical swimsuits.

(3) Paragraph 1(m)(4) is deemed amended to delete hockey equipment, to delete baseball bats and to exclude catcher's mitts.

(4) Paragraph 5(a) is deemed amended to modify NIKE's product supply obligation as follows:

| Contract Year | Product Supply |
|---|---|
| 2012-2013 (CY6) | $2,426,014 |
| 2013-2014 (CY7) | $2,526,014 |

(5) If NIKE exercises its option to extend the Agreement pursuant to Paragraph 12(a), as amended below under this Second Amendment, NIKE's product supply obligation for the four (4) additional Contract Years (i.e. August 1, 2014 - July 31, 2018) shall be as set forth below, and Paragraph 5(a) of the Agreement shall be deemed amended accordingly:

| Option Year | Product Supply |
|---|---|
| 2014-2015 (OY1) | $2,526,014 |
| 2015-2016 (OY2) | $2,626,014 |
| 2016-2017 (OY3) | $2,626,014 |
| 2017-2018 (OY4) | $2,726,014 |

(6) The first sentence of Paragraph 5(b) is amended to state as follows:

"During each Contract Year, Coaches, Staff, and select employees of the Athletic Department (in UNIVERSITY's discretion), shall be entitled to order NIKE Product for their personal use, up to an aggregate maximum amount (in terms of retail value) of $166,000; except that, in the event Thad Matta ceases for any reason to serve as the Coach of the Men's Basketball Program, the aggregate maximum amount (in terms of retail value) shall be $150,000."

{00171868-2}

(7) If NIKE exercises its option to extend the Agreement pursuant to Paragraph 12(a), as amended below under this Second Amendment, NIKE shall pay Base Compensation for the four (4) additional Contract Years (i.e. August 1, 2014 - July 31, 2018) in the amounts set forth below, and Paragraph 8(a) of the Agreement shall be deemed amended accordingly:

| Option Year | Base Compensation |
|---|---|
| 2014-2015 (OY1) | $1,488,000 |
| 2015-2016 (OY2) | $1,488,000 |
| 2016-2017 (OY3) | $1,488,000 |
| 2017-2018 (OY4) | $1,488,000 |

(8) Paragraph 12(a) is deleted in its entirety and restated as follows:

"(a)    NIKE shall have an option to extend this Agreement for an additional term of four (4) Contract Years (i.e. August 1, 2014 - July 31, 2018) on the same terms and conditions as prevailing for CY7 (except as otherwise expressly provided in the Agreement and any amendments thereto), by giving notice to UNIVERSITY not later than February 1, 2013."

(9) Paragraph 12(c) is deleted in its entirety and restated as follows:

"(c)    Prior to February 1, 2013 (or February 1, 2017 if this Agreement has been extended by NIKE as provided in Paragraph 12(a), as amended above under this Second Amendment) (in either case, the "Negotiating Date"), UNIVERSITY shall not engage in discussions or negotiations (nor shall UNIVERSITY permit its agents, attorneys or representatives to do so) with any third party regarding equipment supply for UNIVERSITY with respect to any Products, or sponsorship of any UNIVERSITY Intercollegiate Athletic Program (or similar supply or promotional arrangement) with respect to any Products ("Product Supply/Sponsorship Rights") after the Term. It is understood that UNIVERSITY may become aware of third party items which may be of some utility to the Intercollegiate Athletic Programs and nothing in this subparagraph 12(c) shall prohibit or bar UNIVERSITY from adopting, or discussing or negotiating the adoption of, such items, provided that such items are not Products, and otherwise subject to the provisions of the Agreement and any amendments thereto."

Except as expressly modified above, the Agreement remains in full force and effect.

NIKE USA, Inc.

BY: _____

TITLE: VP, NA Sports Mktg.

DATE: 10/8/12

BY: Gary D. Way

TITLE: Global Counsel, Sports Marketing

DATE: 10/12/12

The Ohio State University

BY: Geoffrey S Chatas

Geoffrey S. Chatas
Sr. Vice President for Business & Finance and CFO

DATE: 8.8.12

BY: _____

TITLE: _____

DATE: _____

### THIRD AMENDMENT TO EQUIPMENT SUPPLY AGREEMENT

The Ohio State University, on behalf of its Department of Athletics, and NIKE USA, Inc. ("NIKE") entered into an Equipment Supply Agreement effective August 1, 2007 and amended August 20, 2007 and October 12, 2012 (collectively, the "Supply Agreement").  NIKE and The Ohio State University, on behalf of its Department of Athletics ("UNIVERSITY") and its Office of the President ("PRESIDENT'S OFFICE")  hereby agree to further amend and modify the Supply Agreement effective August 1, 2015 (unless otherwise indicated) as follows:

1.  Paragraph 1(a) is deleted in its entirety and replaced with the following:

> "College Football Playoff" or "CFP" shall mean the NCAA Football Bowl Subdivision national championship game and the two (2) bowl games designated from the following six (6) bowl games (or replacement bowl games) to serve as the NCAA Football Bowl Subdivision semifinals during the relevant Contract Year: Peach Bowl, Cotton Bowl, Orange Bowl, Sugar Bowl, Fiesta Bowl, and Rose Bowl."

2.  Paragraph 1(g) is hereby amended by the removal of the number "36" from the first sentence.

3.  Paragraph 1(m) is deleted in its entirety and replaced with the following:

> "Products" shall mean:
>
> (1)  all athletic and athletically inspired or derived footwear (specifically excluding hockey skates and field hockey shoes) that members of any Team, Coaches and/or Staff wear or may be reasonably expected to wear while participating in their respective Intercollegiate Athletic Program;
>
> (2)  authentic competition apparel consisting of uniforms, sideline or courtside jackets and sweaters, game-day warm-ups, basketball shooting shirts, football player capes, wool and fitted caps, windsuits, rainsuits, sideline or courtside pants, shorts and shirts, and similar apparel, and practicewear including "base-layer" apparel (e.g., compression/tight and non-compression gear typically worn underneath outer garments including padded and non-padded base layer products), and similar apparel, practicewear, thermal wear (excluding Bauer ice hockey thermal wear, provided that UNIVERSTIY shall not source such products from any other party without written approval from NIKE), and performance undergarments worn as a "base layer." (collectively, "Authentic Competition Apparel") that members of any Team, Coaches and/or Staff wear or may be reasonably expected to wear while participating in their respective Intercollegiate Athletic Program.  Authentic Competition Apparel does not include swimsuits, competition apparel for gymnastics, and competition apparel for cheerleading;
>
> (3)  all other apparel articles of an athletic or athleisure nature including but not limited to tank-tops, T-shirts, sweatsuits, separates and other body coverings, and accessories of an athletic or athleisure nature, including but not limited to headwear, headbands, wristbands, compression recovery products (e.g., suits, sleeves, tights, hose, footwear, etc.) except if UNIVERSITY medical personnel determine, in the good faith exercise of their professional judgment, that a non-NIKE compression product must be utilized, bags, socks, hand-towels (not including Gatorade or other sport drink towels in the Teams' bench areas), receiver's and linemen's gloves and batting gloves that members of any Team, Coaches and/or Staff wear or use or may be reasonably expected to wear or use while participating in their respective Intercollegiate Athletic Program; and
>
> (4)  sports equipment including, but not limited to, inflatable balls (specifically including without limitation basketballs); baseball equipment; Softball equipment (excluding bats, fielding gloves, and catchers' equipment); non-prescription protective eyewear, eyewear with

performance attributes and sunglasses; sports timing devices (including wristwatches, race timers, stopwatches, etc. and devices used for competition or training that are also used in combination with timing devices such as heart-rate monitors or calorimeters; excluding golf clubs, but including such other equipment as NIKE may add to its product lines at any time during the term of this Agreement and subject to the provisions of Paragraph 13 below, provided that such Products shall meet UNIVERSITY'S good faith requirements for quality. "Products" shall specifically not include the following items (subject to NIKE's rights under Paragraphs 8(g) and 13): volleyballs, baseball bats, baseball fielding gloves (provided that NIKE shall have non-exclusive rights to offer such products to the baseball program and UNIVERSITY shall not enter into an exclusive product supply arrangement with any third party for such products), softball bats, softball fielding gloves and softball catchers' equipment, ice hockey equipment, golf clubs, golf balls, field hockey equipment, swimming training equipment, tennis racquets, lacrosse equipment, pistol / rifle equipment, fencing equipment, helmets and other protective head gear or face gear.

4.  Paragraph 1(p) (definition of "Tier I Bowl") is deleted in its entirety and intentionally left blank.

5.  Paragraph 1 is further amended to add the following new Subparagraph 1(s):

> "1(s) "Student Life" shall mean the Office of Student Life at UNIVERSITY's Columbus campus (including any additional, replacement or successor department that similarly focuses on student activities on a university-wide basis) and all programs, activities, events and departments sponsored or serviced by such organization (including, without limitation, recreational sports and health and wellness programs, and facilities) and such other replacement or additional student programs (administered through the Office of Student Life including any additional, replacement or successor department that similarly focuses on student activities on a university-wide basis) dedicated to supporting student involvement and student engagement activities."

6.  Paragraph 2 is amended to provide that the "Term" of the Agreement is extended fifteen (15) "Contract Years" from August 1, 2018 through July 31, 2033 (such period shall be referred as the "Extension Period", and together with all other Contract Years, the "Term").

7.  Paragraph 5(a) is amended to include the following:

(i)  NIKE's product supply obligations (calculated on the basis of suggested retail price) for the Extension Period shall be as follows:

| Contract Year | Product Supply |
| --- | --- |
| 2018-19 Contract Year | $5,600,000 |
| 2019-20 Contract Year | $5,700,000 |
| 2020-21 Contract Year | $5,800,000 |
| 2021-22 Contract Year | $5,900,000 |
| 2022-23 Contract Year | $6,000,000 |
| 2023-24 Contract Year | $6,100,000 |
| 2024-25 Contract Year | $6,200,000 |
| 2025-26 Contract Year | $6,300,000 |
| 2026-27 Contract Year | $6,400,000 |
| 2027-28 Contract Year | $6,500,000 |

| 2028-29 Contract Year | $6,600,000 |
|---|---|
| 2029-30 Contract Year | $6,700,000 |
| 2030-31 Contract Year | $6,800,000 |
| 2031-32 Contract Year | $6,900,000 |
| 2032-33 Contract Year | $7,000,000 |

(ii) Commencing with the 2015-2016 Contract Year, UNIVERSITY shall be entitled to order up to an additional $5,000,000 (calculated on the basis of suggested retail price) of NIKE Products over the remainder of the Term.

(iii) Commencing with the Extension Period, each Contract Year the PRESIDENT'S OFFICE shall be permitted to order, in conjunction with UNIVERSITY's annual orders for its Intercollegiate Athletic Programs, up to the following amounts (calculated on the basis of suggested retail price) of NIKE Products for distribution to the Office of Student Life, in its sole discretion: 2018-19 Contract Year: $500,000; 2019-20 Contract Year: $510,000; 2020-21 Contract Year: $520,000; 2021-22 Contract Year: $530,000; 2022-23 Contract Year: $540,000; 2023-24 Contract Year: $550,000; 2024-25 Contract Year: $560,000; 2025-26 Contract Year: $570,000; 2026-27 Contract Year: $580,000; 2027-28 Contract Year: $590,000; 2028-29 Contract Year: $600,000; 2029-30 Contract Year: $610,000; 2030-31 Contract Year: $620,000; 2031-32 Contract Year: $630,000; 2032-33 Contract Year: $640,000.

8. Paragraph 5(b) is amended to provide that, commencing with the 2015-16 Contract Year and ending with commencement of the Extension Period, the aggregate maximum amount of NIKE Product that may be ordered through NIKE's Elite Client Services (formerly known as "NIKE by Mail" program) (including, but not limited to, NIKE Elite Soccer, NIKE Elite Basketball and Nike Elite Golf) each Contract Year shall be $175,000 (calculated on the basis of suggested retail price). NIKE's representatives shall not make agreements with UNIVERSITY Coaches outside of this Agreement.

Paragraph 5(b) is further amended to provide that, commencing with the Extension Period, the aggregate maximum amount of NIKE Product that may be ordered through NIKE's Elite Client Services (including, but not limited to, NIKE Elite Soccer, NIKE Elite Basketball and Nike Elite Golf) each Contract Year shall be $250,000 (calculated on the basis of suggested retail price).

9. Paragraph 7(a) is amended to include that, to the extent the PRESIDENT'S OFFICE issues, authorizes or approves the issuance of any Products, including, but not limited to, Student Life employees, volunteers, events, programs, recreational or intramural sports, and student engagement activities, such Products shall be either (i) NIKE Products or (ii) generic unbranded products (e.g., private label/no manufacture mark or unique design elements appearing on the exterior of such products) not designed or manufactured by a NIKE Competitor (as defined below) (such products "Generic/Unbranded Products"). NIKE will make NIKE Products available at favorable pricing from a NIKE Team dealer, and PRESIDENT'S OFFICE shall encourage club sports programs and other University departments or offices to purchase all of its Product requirements from NIKE's Team dealer, provided that such groups shall not be obligated to purchase NIKE Products. Notwithstanding the foregoing, the PRESIDENT'S OFFICE shall ensure that if any club sports program sells any Products to fundraise (e.g., sells club branded t-shirts), such Products may only be either (i) NIKE Products, or (ii) Generic/Unbranded Products. In no event shall the PRESIDENT'S OFFICE (including, but not limited to, its Office of Trademark and Licensing Service) authorize any NIKE Competitor to use UNIVERSITY Marks on any products.

For purposes of this Agreement, "NIKE Competitor" shall mean (1) adidas, Reebok, Puma, Under Armour, New Balance, Asics, Saucony, Li-Ning, Anta, Starter and/or their respective affiliates, brands, controlled brands or licensees, the identity of which is known to UNIVERSITY (by notice from NIKE or otherwise), or (2) any other company or brand, the identity of which is known to UNIVERSITY (by notice from NIKE or otherwise) that generates more than both (A) ten percent (10%) of its annual revenue and (B) at least ten million dollars ($10,000,000) annually at wholesale from the sale of athletic footwear.

Paragraph 7(a) is further amended to add the following:

> "If, during the Term, NIKE notifies UNIVERSITY that it will no longer supply UNIVERSITY with a Product set forth in Paragraph 1(m) (an "Unavailable Product"), then UNIVERSITY shall thereafter be permitted to source such Product from a third party on a complimentary or reduced price basis, provided, however, (i) such third party cannot be a NIKE Competitor, (ii) any logos or unique design elements of a brand NIKE considers to be an athletic apparel or footwear competitor, in its sole discretion, shall be removed, covered or obscured at NIKE's request, (iii) unless permitted by NIKE in writing, UNIVERSITY shall not endorse or otherwise promote or advertise its use of such third party's Product, and shall not permit such third party to promote or advertise its association with UNIVERSITY or the applicable Intercollegiate Athletic Program, provided, however, UNIVERSITY's Director of Athletics and NIKE's Senior Director of College Sports Marketing shall discuss, in good faith, permitting UNIVERSITY to enter into endorsement, sponsorship, promotional, consulting or similar agreements (including the provision of signage or other media) with a third-party supplier of an Unavailable Product, if such agreement relates solely to the Unavailable Product(s), and the benefits to be provided such third party are approved by NIKE in advance (notwithstanding the foregoing, NIKE shall have no obligation to permit the foregoing), and (iv) UNIVERSITY shall switch to the use of such NIKE Product if such Unavailable Product is later made available through NIKE."

10. Paragraph 7(f) is deleted in its entirety as NIKE will no longer supply volleyballs to either the men's or women's volleyball Teams under the Supply Agreement.

11. Paragraph 8(a) is amended to include the following:

   (i)   NIKE shall pay UNIVERSITY Base Compensation each Contract Year during the Extension Period as follows:  $3,440,000 each Contract Year over the period of Contract Years commencing August 1, 2018 and ending July 31, 2029, and $4,440,000 each Contract Year over the period of Contract Years commencing August 1, 2029 and ending July 31, 2033 (subject to the below Advance).

   (ii)  Commencing with the Extension Period, each Contract Year NIKE shall make a cash contribution to a Student Life endowment fund in the amount of $1,000,000 ("Student Life Compensation") (subject to the below Advance), to be made on or before January 1 of each Contract Year.

   (iii) NIKE shall pay UNIVERSITY a one-time cash payment of $2,500,000 to fund general student scholarships awarded at UNIVERSITY's discretion.  Such payment will be made within thirty (30) business days of receipt of invoice from UNIVERSITY.

{00281826-1}4

(iv) NIKE shall pay UNIVERSITY a one-time advance payment of $20,000,000 within thirty (30) business days of receipt of an invoice from UNIVERSITY (the "Advance"). The Advance shall be used to create an athletic endowment for use at the discretion of UNIVERSITY and shall consist of advance payments of the following amounts: (1) annual Base Compensation in the amount of $4,000,000 from each of the last four Contract Years of the Extension Period (i.e., $16,000,000 total or $4,000,000 per Contract Year); and (2) annual Student Life Compensation equal to $1,000,000 from each of the last four Contract Years of the Extension Period (i.e., $4,000,000 total). For avoidance of doubt, the Advance shall (x) satisfy the scheduled payments (in whole or in part) for each of the foregoing at the time such payments become due and (y) be subject to all terms and conditions of the Supply Agreement and, as applicable, the Standard License Agreement, as if paid in the respective Contract Year(s) (e.g., any applicable prorations, reductions, etc.).

12. Paragraph 8(g) is deleted in its entirety and replaced with the following:

"In the event UNIVERSITY adopts any NIKE Products as new Products during the term hereof, and in so doing ends a relationship under which UNIVERSITY had received cash compensation, free/reduced cost product and/or compensation for exceptional achievements in connection with its use of such non-NIKE Products in the past, UNIVERSITY's Base Compensation hereunder shall not be increased by the amount of such cash compensation. However, NIKE's Product Supply obligations provided in Paragraph 5(a) herein shall be increased annually for the duration of this Equipment Supply Agreement in an amount commensurate with the product supply lost by the UNIVERSITY as a result of ending its relationship with the former source, and UNIVERSITY's Director of Athletics and NIKE's Senior Director of College Sports Marketing shall discuss, in good faith, amending Schedule A to include commensurate compensation/benefits for the exceptional achievements that were included in the contract with the former source."

13. Paragraph 9 is amended to provide that, commencing with the Extension Period, each summer during the Term NIKE shall fund paid internships (paid at market rate) for two (2) student-athletes and four (4) undergraduates.

14. Paragraph 12(c) is amended to provide that the "Negotiating Date" shall be October 1, 2031.

15. The first sentence of Paragraph 12(d) is amended to delete the reference to "one hundred eighty (180)" and replace such reference with "ninety (90)". All other terms of such Subparagraph remain unchanged.

16. Paragraph 12 is amended to add the following new Subparagraph 12(e):

"12(e) In the event the NCAA Division I Committee on Infractions sanctions the UNIVERSITY by placing the institution on probation for a "Level I violation" of NCAA rules (or UNIVERSITY self-imposes sanctions) that results in any Flagship Program being placed on NCAA probation which results in a television or post-season appearance ban for longer than a single playing season and/or (2), then in lieu of exercising its right of termination under Paragraph 15 below, NIKE shall have the right, exercisable upon written notice to UNIVERSITY, to extend the Term for the number of Contract Years that corresponds to the number of

impacted seasons on the same terms in effect at the time of imposition of such sanctions (and subject to any applicable reductions).  (For example, if the football program was subject to a 2-year post-season competition ban, NIKE would be entitled to extend this Agreement for a period of 2 additional Contract Years.)  Such right shall only be exercised within one (1) year after the issuance of a final decision by the NCAA following the conclusion of any internal appeal process (or the implementation of self-imposed sanctions)."

17. Paragraph 13 is amended to delete the final two sentences of such Paragraph and replace them with the following:

"In addition, if UNIVERSITY's former source for such new Product item(s) had been paying annual cash consideration, free/reduced cost product and/or compensation for exceptional achievements to UNIVERSITY, in consideration of UNIVERSITY's use of such new Product item(s), NIKE shall not be required to match the cash consideration.  However, NIKE's Product Supply obligations provided in Paragraph 5(a) herein shall be increased annually for the duration for this Equipment Supply Agreement in an amount commensurate with the benefits lost by the UNIVERSITY as a result of ending its relationship with the former source and UNIVERSITY's Director of Athletics and NIKE's Senior Director of College Sports Marketing shall discuss, in good faith, amending Schedule A to include commensurate compensation/benefits for the exceptional achievements that were included in the contract with the former source."

18. Paragraph 19 is amended to change the address of the UNIVERSITY's Department of Athletics as follows:  Fawcett Center, 2400 Olentangy River Rd., Columbus, OH  43210 and to change the address of the UNIVERSITY's Legal Department as follows:  1590 N. High St., Suite 500, Columbus, OH  43201

19. Paragraph 20 is amended to add the following:

"All individuals employed by NIKE to provide personal services to UNIVERSITY are not public employees for purposes of Chapter 145 of the Ohio Revised Code, as amended."

20. The first sentence of Paragraph 24(a)(1) shall also be amended to provide that UNIVERSITY shall not enter into an endorsement, sponsorship, promotional, consulting or similar agreement (including the provision of signage or other media) with any person or entity who manufactures, sells, fulfills or otherwise distributes Products (via the internet or otherwise) other than NIKE; provided, however, that UNIVERSITY's Director of Athletics and NIKE's Senior Director of College Sports Marketing shall discuss, in good faith, permitting UNIVERSITY to enter into such agreements with a third party, if such agreements relate solely to products that are excluded from the list of Products under Section 1(m) of this Agreement, and the benefits to be provided such third party are approved by NIKE in advance.  Notwithstanding the foregoing, NIKE shall have no obligation to permit the foregoing.  For avoidance of doubt, the foregoing shall not restrict UNIVERSITY from entering into a product supply arrangement with a third party to source products not included as a "Product" under Section 1(m), provided such third party is not a NIKE Competitor.

21. The following is added as Paragraph 29:

> "29.    COMMUNITY PRESENCE.    In support of the relationship between the parties, NIKE shall use commercially reasonable efforts to maintain a presence at and around UNIVERSITY's Columbus campus.  Such presence may include, but is not limited to, holding meetings or events in the area, NIKE-brand pop-up retail locations, sponsorship activations, camps, clinics, lecturing at academic classes, television or photography shoots, advertising or signage, etc.  During the Extension Period, NIKE will spend no less than $15,000,000 total over the Extension Period in support of mutually agreeable University initiatives outside the Athletics Department (to the extent NIKE materially changes its current marketing investment strategy, such changes shall be subject to approval by the President of The Ohio State University).    The foregoing spend must be on "hard costs" (e.g., there won't be any allocation of NIKE's overhead against this obligation)."

22. The following is added as Paragraph 30:

> "30.    REVIEW.  No later than January 1, 2022, and upon request of the UNIVERSITY, the parties shall meet and discuss in good faith the administration of the Agreement.  Such discussion may include, without limitation, the general terms of the Agreement, the product needs of Covered Program(s), product service requirements, Schedule A's performance bonuses and sponsor benefits. The parties agree to meet for a second review no later than January 1, 2029, upon request of UNIVERSITY."

23. Schedule A of the Supply Agreement is deleted in its entirety and replaced with the attached Schedule A.

[Signature Page Follows]

Except as modified by this Third Amendment, all defined terms used within this Amendment shall have the same meaning ascribed to them under the Supply Agreement, all other terms and conditions of the Supply Agreement shall remain in full force and effect, and all rights and obligations under this Amendment shall be exercised consistent with the Supply Agreement.  This Amendment may be executed in counterparts manually or by the application of digital or electronic signatures.

The Ohio State University                         NIKE USA, Inc.


By: _____          By: _____

Geoffrey S. Chatas                                 Jonathan Banks

Senior Vice President for Business & Finance & CFO    Vice President, North America Sports Marketing

Date: ___12/16/2015_____          Date: ___12/16/15_____


By: _____          By: _____

Eugene Smith                                        Its: _Executive Vice President,_
                                                    _Global Sports Marketing_
Vice President and Director of Athletics


Date: ___12-16-15_____             Date: __1-5-16_____


Fed. Id. No.: 31-6025986

{00281826-1}8

## SCHEDULE A

### Performance Bonuses

In the event the indicated team achieves any of the following performances during any Contract Year, UNIVERSITY shall, within ninety (90) days of such accomplishment, invoice NIKE for payment of the corresponding bonus amount (and which bonus UNIVERSITY acknowledges may be subject to forfeit if not timely invoiced) which NIKE shall pay within thirty (30) business days of its receipt thereof:

| Football Bonuses[1] | |
| --- | --- |
| Plays in Big10 Championship Game | $10,000 |
| Wins Big10 Championship Game | $20,000 |
| Plays in a CFP semifinals game | $25,000 |
| Plays in the National Championship game | $50,000 |
| Wins National Championship | $100,000 |
| **Men's Basketball Bonuses** | |
| Wins National Championship | $25,000 |
| Wins Conference Championship | $10,000 |
| Top 5 Ranking[2] | $ 3,500 |
| .950 Season Winning % | $ 3,500 |
| **Women's Basketball Bonuses** | |
| Wins National Championship | $7,500 |
| Wins Conference Championship | $5,000 |
| Top 5 Ranking[2] | $3,000 |
| .950 Season Winning % | $3,000 |

[1]The parties acknowledge that NIKE has paid UNIVERSITY $100,000 for UNIVERSITY's 2014-15 National Championship Win. NIKE shall pay the additional $105,000 bonus amount due for the 2014-15 season within 30 days of full execution of this Third Amendment.

[2]Based on final *USA Today* or AP Final Poll (whichever is higher).

Unless otherwise indicated, all bonuses listed above are cumulative (i.e., if men's basketball achieves all of the above performances, UNIVERSITY would be eligible for $42,000 in bonuses).